David JORDAN, et al., Plaintiffs,

v.

CITY OF GREENWOOD, et
al., Defendants.

No. GC 77–51–WK–P.

United States District Court,
N. D. Mississippi,
Greenville Division.

March 23, 1982.

Willie Perkins, Greenwood, Miss., for plaintiffs.

Billy Bowman, Greenwood, Miss., for defendants.

## MEMORANDUM OPINION

KEADY, Chief Judge.

In this action, David Jordan, James Moore, Robert Sims, and Sammie Lee Chestnut, representing classes of all black citizens and black registered voters of the City of Greenwood, sue the City, its mayor, city commissioners, and the City Municipal Election Commission and its members,[1] alleging racial discrimination in the adoption and maintenance of at-large city elections for Greenwood's mayor and commissioners under the commission form of government as allegedly violative of the thirteenth, fourteenth, and fifteenth amendments to the United States Constitution, 42 U.S.C. § 1983, and § 2 of the Voting Rights Act of 1965 (42 U.S.C. § 1973). In October 1980 the court conducted a lengthy evidentiary hearing.[2] Because of the confused state of the law regarding elements necessary to prove violations of

1. At the close of plaintiff's case-in-chief, the court dismissed as defendants the City's Republican and Democratic Party Executive Committees.

2. On March 2, 1982, the court ordered the trial record supplemented to show the results of the 1981 municipal primary and general elections.

the sort complained of in the case sub judice, the court stayed ruling pending clarifying development of case law. Although somewhat contradictory decisions remain in controlling precedent, the court concludes that further delay will serve no useful purpose and hereby enters the following findings of fact and conclusions of law as required by Rule 52(a), F.R.Civ.P.

## I. FINDINGS OF FACT

*The 1914 Referendum*

Prior to 1914, Greenwood operated under a mayor-alderman form of municipal government under which the mayor and one alderman were elected at-large, and four additional aldermen were elected from each of four wards. On March 16, 1914, however, the City adopted the present mayor-commission system by city-wide referendum, 250 votes cast in favor of the commission form and 47 votes against. At this time in the City's history, blacks were disenfranchised and accordingly did not vote in the referendum. Under the commission form of government, the mayor and two commissioners are elected at-large; one of the commissioners is in charge of streets and sanitation, while the other oversees police and fire departments. The mayor and two commissioners compose the city council, and each has the right to vote on all questions coming before the council.

The 1914 referendum was authorized by a 1912 enactment by the Mississippi Legislature enabling a city, upon election by its voters, to change its government system and adopt the commission form of government.[3] See Miss.Code Ann. § 21–5–1 et seq. The establishment of the commission form of government was one of the reforms of the progressive movement that swept the United States in the early twentieth century. The form originated in Galveston, Tex-

as, as a measure perceived by businessmen to speed recovery from the great hurricane of 1900. Because of its success, the commission system spread to other cities that strove for businesslike efficiency as a reaction against corruption and abuses in "boss-control" of ward politics. Use of this form of government declined after World War II, and by 1980 only 198, or less than 5%, of American cities employed the commission system. Cities which continue to use the commission form, however, are scattered throughout the nation, e.g., Portland, Oregon, Kansas City, Missouri, and Atlantic City, New Jersey, as well as in the South.

According to plaintiffs' expert historian, Dr. Charles Sallis, reforms in Mississippi during the "progressive period" were enacted largely as devices to discriminate against blacks. Sallis was of the opinion that phrases such as "good government" and "corruption" were synonymous with "white control" and "black disenfranchisement." This opinion was based on certain Mississippi newspaper articles appearing in the 1900–1910 decade. He alluded to an article in the *Laurel Chronicle* on April 7, 1908, which stated:

> It has come to the attention of the Chronicle that a few cities, where a foreign or vicious element predominates in certain wards resulting in the election of incongruent board of aldermen, are adopting or advocating the adoption of the commission form of government as a relief from this condition. Two cities in this state [Biloxi and Gulfport] advocated the passage of the act by the legislature with this in view.

Sallis acknowledged, however, that this mention of "a foreign or vicious element" reportedly electing inharmonious officials did not necessarily refer to blacks. He also cited a November 24, 1906, article in the

---

**3.** Mississippi law presently allows for the adoption of three structures of municipal government other than the commission type: a council form of government, under which the mayor is elected at-large and six council members are elected from wards, is available for code charter municipalities having a population of 8,000–9,600, § 21–7–1 et seq.; a mayor-council form, under which the mayor is elected at-large and a council consisting of five, seven, or nine members, all of whom are elected from wards, § 21–8–1 et seq. (1981 supp.); and council-manager form, under which the mayor is elected at-large and five council members are elected either at-large or from wards, depending on local ordinance, and the council appoints a city manager as the city's chief administrative officer, § 21–9–1 et seq.

*Greenville Times* which stated: "I oppose the bringing of the Negro back into politics, which going under the code and allowing the wards to select their aldermen, will surely do." Sallis also founded his opinion on the premise that former Governor James K. Vardaman, in editing a newspaper advocating "white supremacy," endorsed the commission form of government.

The court declines to accept, on the basis of this sketchy evidence, a conclusion that the progressive movement in general and the adoption of the commission form of government in particular by certain Mississippi municipalities in the early twentieth century was racially motivated. During this period in the state's history, blacks were and had been effectively disenfranchised by the use of poll taxes, residency requirements, and literacy tests as lawful impediments to voting, and therefore did not pose a threat to the white electorate. Indeed, had whites perceived that blacks might soon come to widely possess the franchise, it appears more likely that the commission form of government would be more adverse to political control by whites in most Delta cities, including Greenwood, since blacks then comprised a large majority of citizens residing in that section of the state.

In addition, the court finds that adoption of the commission form of government in Greenwood was motivated by economic reasons. As written on February 13, 1914, in a Greenwood newspaper:

> The Commission—City Manager—Form of Government is more economical for the reason that it is not necessary to pay a big salary to each of the Commissioners, and naturally it follows that the City Manager, being entirely free of any political influence, and working only for the city, with his personal interest at stake, (for by his record depends his advancement), is going to put forth his best efforts to show good results. He will be economical in his purchases and expenditures; he will see that all the employees do their full duty and serve the city corporation, as other corporations have their employees serve them. In other words, the business of the city would be run on business principles.

Only one Greenwood newspaper article may be said to lend itself to an interpretation that racial considerations were interjected in the 1914 referendum process. This article which appeared on March 14, 1914, the day of the referendum, urged a vote for the proposed form of government, stating in part as follows:

> So don't be misled by any of the stuff that under Commission Government the "Big Bugs" will have charge of everything. Commission Government for Cities is the most popular representative government for Cities. The people have far more power under it than they do under the Aldermanic system. *The negro in the woodpile exists only in the imagination of certain politicians.*
>
> Cities that have adopted it have never given it up and unless you expect some personal benefit from the old system you are standing in your own light if you do not vote for Commission Government Monday. (Our emphasis).

The phrase "negro in the woodpile" is an obsolete expression that quite obviously refers not to black voters but to a charge that those opposing the commission form of government were misleading the electorate into believing that control of the city would be vested in certain "Big Bugs," i.e., that the political power would be concentrated in the hands of a few persons. The quoted phrase, according to eminent language authority, means "a dubious and improbable element in a situation esp. when regarded as possibly harmful or undesirable." Random House Dictionary of the English Language (unabridged ed. 1973) p. 966. Webster's Third New International Dictionary (unabridged ed. 1965) p. 1527, defines the phrase as: "something (as a concealed motive or obscure factor) contrary to appearances in a situation." These explanatory definitions support the only possible meaning of the expression as used in the article, given the context in which it appears, and renders farfetched an application to race as such. The great weight of the evidence

supports the view that Greenwood's electorate accepted the commission form of government in 1914 for business and economic reasons to enhance the efficiency of the municipal government, and not because of racial motivations or considerations, and the court so finds as a fact.

### Blacks' Defeats at the Polls

According to the 1970 census data, Greenwood has a voting age population (18 years and older) of 13,906, of whom 7,612 are white (49.63%) and 6,204 are black (44.61%). The City's total population, under the 1980 census, is 20,115, with a majority black population (52%). However, whites have a majority of the voting age population and registered voters. The City is divided into three wards or precincts, East Greenwood which is predominantly black, North Greenwood which is all white, and West Greenwood which is a mixed neighborhood.

No black citizen has been elected to any seat on the Greenwood City council, although several have run for election. Pinkie Pilcher, black candidate for commissioner post 1 in the May 11, 1965 election was defeated by a white candidate by a vote of 2,400 to 61. William Wallace, black candidate for commissioner post 1 in the June 3, 1969 election, was defeated by a white by a vote of 3,757 to 2,339. John H. Johnson, black candidate for mayor in the June 5, 1973 election, was defeated by a white by 3,723 to 1,146 votes. Robert Robertson, black candidate for commissioner post 1 in the June 5, 1973 election, was defeated by a white by 3,647 to 1,102 votes. The black candidates did not enter the Democratic primaries but ran as Independents in the general elections.

Most recent are the 1981 Democratic primary elections which included black candidates Percy Washington, running for commissioner post 2, and Joseph W. Curtis, running for commissioner post 1, who were both defeated in the second Democratic primary runoff election by their white opponents by votes of 2,730 to 1,366 and 2,736 to 1,388, respectively. No blacks entered the general elections held on June 2, 1981, when three whites, a Republican mayor, Lanier Harper, and two Democratic commissioners, were elected to office. None of the black candidates at any general election or primary have received more than relatively few of the votes cast in the North Greenwood ward.

### The 1977 Referendum

On July 13, 1977, approximately two months after this suit was filed, the Greenwood Voters League (GVL), a highly vocal all-black political organization which regularly endorses candidates sympathetic to the black community and of which David Jordan is president, presented the City Council with a petition signed by 2,186 qualified electors calling for an election to determine if the City should change its form of government to a mayor-council form to include the election of seven councilmen from wards. The petition was presented just one month after the former mayor, Louis Fancher, Jr., and Commissioners Sam Bass and E. M. Ambrose had been elected for four-year terms. Fancher and Ambrose had been publicly endorsed by GVL. At the referendum held on September 6, 1977, 2,766 persons voted to retain the commission system and 1,069 voted to change to the mayor-council form. As had been generally true in previous Greenwood elections, voting was predominantly along racial lines, with blacks voting for the change and whites against it.

The GVL's campaign to change the government structure was directed largely to what was perceived as a racially discriminatory effect of the at-large system on black representation. Hite McLean, a local attorney and Chairman of the City Democratic Executive Committee, formed a group known as Citizens for our Present Form of Government to campaign against the change in government form. Although McLean during the 1960's had organized a "white citizens committee" to oppose the Civil Rights Act of 1964, he, in a newspaper interview, denied racial motivations in opposing the change and stated:

We want our committee to be nonpartisan and nondiscriminatory. We've invited the Republican Municipal Executive Committee to join with us. We invite

any members of the Greenwood Voters League—or any blacks—opposed to the change to come over and join us, too. We may be mostly conservative Democrats thus far, but the committee is not restricted by any conditions, political or racial.

Another attorney, Hardy Lott, serving as counsel for the Greenwood Separate Municipal School District, publicly opposed the change. Like the Citizens for our Present Form of Government, the reasons cited for the opposition were (1) the present form of government was more representative of the desires of the majority since commissioners represent the city, instead of "special interest" wards; (2) the mayor-council form, consisting of seven council members, would be, in effect, more bureaucratic and less efficient; and (3) the proposed form of government would be more expensive since there would be more salaries to pay. Commissioner Sam Bass expressed views against the change in government form, but made it clear that these views were personal only, and not those of the city council. Neither Mayor Fancher nor Commissioner Ambrose took a public position on the issue.

Two days before the referendum election, Citizens for our Present Form of Government printed a one-quarter page newspaper advertisement urging a vote against changing the commission form of government. Its objections to the proposed mayor-council system were as follows:

—Divides voters racially and geographically—ward selectmen are only interested in their ward rather than city as a whole. Creates friction—more likely to cause deadlocks in city government.

—Only one administrative member, the Mayor. He must depend upon an "administrative aide," to be hired at unspecified expense, to conduct city affairs.

—No longer would all citizens have the right to vote on all members of their city government. Under present system, every vote, black or white, is of equal value.

—Raises the spectre of one-man autocratic rule.

—Opens the door to government by special interest groups.

—Under proposed system, no commissioner would have any specific responsibility and there would always be the excuse "I wanted to, but I was out-voted by the rest of the council." Under present system each commissioner heads a department and handles a specific job. If there is trouble about the streets, the responsibility is fixed on one man; if there is trouble with the police or fire department, there is one man who has the responsibility of correcting it.

—A mistake by the voters in election of mayor could plunge city into chaos under proposed system.

—Mississippi's capital city, Jackson, and its second largest city, Meridian, have recently voted down the type of government being proposed for Greenwood.

—Lower federal court orders to abolish the commissioner-council form of government are being appealed to the Supreme Court by the cities of Shreveport, Louisiana, and Mobile, Alabama.

—The idea that citizens should voluntarily give up their rights to choose their form of city government because the courts might force them to do so is ridiculous.

—Examples of mayor-council government are New York City, Detroit, and Chicago.

—The drawing of ward lines by city government invites never-ending litigation by civil rights groups.

On the same day, a one-half page article entitled "Pro-Con: Should Greenwood Change its system of city government" appeared in the *Greenwood Commonwealth*. David Jordan argued the position "Yes! Fair representation for people needed," while Hite McLean advocated "No! Change would invite city factional fights." Photographs of both men appeared alongside their articles. In addition to the reasons cited against the proposed change in the advertisement by Citizens for our Present Form of Government, McLean stated:

A city does not need a type of government which would pit one section of the community against another. It does not

need a type of government which would place a middle-income neighborhood against a so-called ghetto, or vice versa. It does not need a government which would divide labor, racial, industrial, civil or other factional interests in the conduct of municipal affairs.

Jordan, on the other hand, noted that under the mayor-council form executive and legislative functions would be separated, and also appealed to the inequity under the present system of blacks being unable to elect representatives, as follows:

We must not allow the idea of a change in city government to degenerate into a confrontation between blacks and whites but rather a confrontation between what is best for our city and what is no longer acceptable to the majority of the citizens of Greenwood—namely, our present form of city government, the Mayor-Commission Form.

We must act now to change our present form of city government while the opportunity presents itself. If we pass the referendum we will have a chance to draw up our own plan (wards) rather than to allow ourselves to be pushed against the wall by the federal courts. Then we will have learned that "it is not good or bad because it is black or white, it is good or bad because it does or does not work."

The present form of city government does not work for the majority of citizens because its at-large system of election denies the basic concept of democracy—representation not only to the city's black citizens but to most of the city's white citizens as well.

The proposed change to the mayor-council form of government was endorsed by the editor and publisher of the *Greenwood Commonwealth*, who stated in an editorial:

We need more black involvement in all of public life, since blacks compose about half of our population. Otherwise, we're going to be ensnarled in court suits forcing the city to do what it ought to be doing on its own.

We need a more efficient form of city government, a form that will be broader than a mayor and two commissioners. We need greater community participation in solving our problems.

In light of these newspaper accounts, we find as a fact that race was interjected as a factor to be considered in voting on the referendum and that this factor was interposed by blacks and whites alike.

At trial, *Commonwealth* editor Emmerich testified that he actually preferred the council-manager form of government for Greenwood since it would bring a greater degree of professionalism in municipal operations. Emmerich was of the view that the commission form was inadequate inasmuch as three commissioners act as legislative and executive departments, rendering city government only as good as the three individuals elected to office. In addition, Emmerich was of the opinion that the at-large system of voting diluted minority voting strength.

Dr. Gordon Henderson, plaintiffs' political science expert, expressed the view that the commission structure is neither responsive nor efficient since it relies on full-time amateur administrators and mirrors majority viewpoints. Henderson asserted that according to many political scientists the commission form of government is obsolete and no good nonracial reason exists for its retention. He also stated that discriminatory impact of at-large voting is particularly pronounced when there are relatively few positions to be filled.

Another of plaintiffs' experts, Dr. Alex Willingham, testified that although the level of black participation in city politics approached that of white involvement, he anticipated that black participation would decrease if the commission form of government remained in effect because blacks would become disillusioned. Willingham noted that the state's requirement of dual registration, i.e., that citizens register in the county office and then in the city office, and the existence of different polling places for city elections and for county and state elections, had the effect of confusing black voters and thereby limiting the number of blacks that actually vote. According to

Willingham, the predominant reason for Greenwood's retention of the present form of government is racial.

Defendants' expert, Dana Brammer, testified that the commission form of government has advantage over other systems in that responsibility for city management is concentrated in a small group of people, thereby making the system more efficient. Brammer also stated that use of at-large, rather than ward, elections is the most popular electoral system in the United States, being employed in more than three-fifths of all cities.

### History of Discrimination

It is well documented that a pattern of racial discrimination in the past has existed in Greenwood and Leflore County. Prior to the passage of the Voting Rights Act of 1965, blacks in Mississippi were effectively disenfranchised through the use of poll taxes, literacy tests, and the like. *See United States v. Mississippi*, 380 U.S. 128, 85 S.Ct. 808, 13 L.Ed.2d 717 (1965). Federal examiners sent to Leflore County during the 1960's assisted in black registration efforts. In 1973, the Fifth Circuit Court of Appeals affirmed this court's decision that the Leflore County Board of Supervisors' redistricting plan diluted black voting strength and worked to deny blacks equal access to the political process. *Moore v. Leflore County Board of Election Commissioners*, 502 F.2d 621 (5th Cir. 1974). In 1976, this court issued an injunction against then Circuit Clerk and Registrar of Leflore County preventing her from denying Mississippi Valley State University students from registering to vote. *Latham v. Chandler*, GC 75–48. In the same year, the City of Greenwood and black plaintiffs entered into a consent decree under which the City was to provide municipal services in a nondiscriminatory manner and agreed to specific street paving programs and recreational facilities in the black community. *Johnson v. City of Greenwood*, GC 75–131. In 1978, the City and black plaintiffs entered a consent order whereby the City agreed to formulate a nondiscriminatory hiring policy, notify former black applicants for city employment of the right to reapply therefor, devise a promotion and transfer policy, and establish an employee grievance procedure. The City also agreed to hire blacks for one-half of all job vacancies. *Johnson v. City of Greenwood*, GC 75–128; *Myers v. City of Greenwood*, GC 77–43. In 1979, this court found that the Greenwood Separate Municipal School District had failed to rehire plaintiff Jordan because of his constitutionally protected criticisms of the school board and issued an appropriate injunction. *Jordan v. Cagle*, 474 F.Supp. 1198 (N.D. Miss.1979), aff'd. mem. 620 F.2d 298 (5th Cir. 1980).

### Current Responsiveness

Plaintiffs failed, however, to show that after complying with federal court orders the City or the elected officials continue to be unresponsive toward the needs and interests of black citizens. Despite some contrary testimony, the overwhelming evidence is that all essential municipal services, such as fire and police protection, sanitation, sewers, streets, and utilities are provided in a nondiscriminatory manner, without disparate treatment to black neighborhoods. Although plaintiffs charged that the chief of police refused to speak before the GVL with regard to crime occurring in the black community, Police Chief Stevens testified that his refusal was not because of lack of interest but a personal belief that he should not appear at political meetings. The credible evidence is that law enforcement is as vigorously carried out in the black community as in the white. The police department dispatches 75% of its personnel to cover predominantly black areas of the City. The court rejects plaintiffs' generalized and unfounded assertions that the white community has better police protection than the black areas of the City. Since black citizens comprise a substantial percentage of the City's voting population, candidates for municipal office actively seek and must gain the support of blacks to be elected. Indeed, the GVL endorsed two of the three individuals for City office elected in 1977 and 1981. Blacks have been appointed to many of the municipal boards and commissions, and serve in policy-making roles. The City has actively sponsored various public housing projects to provide new housing, occupied

principally by blacks. Considering the record as a whole, the court finds as a fact that Greenwood's elected City officials deal fairly and responsively to black citizens in the management of city government.

The court further finds that no official barriers presently exist to the rights of blacks to vote and to run for office. The city clerk's office registers anyone who appears for that purpose before 5 p. m. and is also open one-half day on Saturday four weeks before each registration deadline; and notices to this effect, as well as maps of polling places, are published in the local newspaper at appropriate times. Blacks participate as poll workers and also as challengers at all elections. Although federal examiners attended Leflore County elections at certain times in the past, they have never been assigned to municipal elections in Greenwood. Jordan's general and conclusory testimony that names of qualified black electors have been purged from registration rolls is rejected as unsupported by factual detail; and the charge is countered by the city clerk's testimony that it was not unusual for the name of a voter, irrespective of race, to be omitted from the voters' list through error or inadvertence. Moreover, although the legal requirement that dual registration of qualified electors is required of City voters, first at the office of the Circuit Clerk of Leflore County and again at the office of the City clerk, may be confusing and result in some persons being unable to vote in City elections because of ignorance, the court finds as a fact that this requirement was not manipulated or used to prevent blacks from being qualified municipal electors, and that the procedure employed by the registering officials was not racially motivated. Similarly, there is no credible evidence that use of different polling places for city and county elections is racially motivated. Rather, these are normal and reasonable requirements that result from separate city and county governments which necessitate separate elections by different electorates.

Greenwood's ordinance separates the two commissioner posts for election purposes. Persons seeking the office shall qualify and seek election for a post, as designated in the ordinance, and each post is voted on separately by the qualified electors. To be eligible for office of mayor or commissioner, one must be a qualified elector of the City and shall have been a bona fide resident of the City for at least one year next preceding the date of the commencement of his term of office. There is no requirement that candidates live in any particular section of the City. Miss.Code § 21–5–5 (1972).

## II. CONCLUSIONS OF LAW

As noted at the outset, the law concerning elements necessary to establish discrimination in the adoption and maintenance of at-large voting systems is in a state of flux. The uncertainty arises from the Supreme Court's decision in *City of Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), where the Court considered whether Mobile's at-large system of voting for city commissioners was violative of § 2 of the Voting Rights Act (42 U.S.C. § 1973), the fifteenth amendment, or the fourteenth amendment. The plurality opinion written by Justice Stewart and joined by the Chief Justice and Justices Powell and Rehnquist, reversed the Fifth Circuit's decision ordering disestablishment of the city commission and replacement by a city council composed of members selected from single-member districts and remanded the cause for further proceedings.

The Court first noted that the burden of proof under § 2 of the Voting Rights Act is the same as under the fifteenth amendment:

The Fifteenth Amendment does not entail the right to have Negro candidates elected and neither *Smith v. Allwright* [321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944)] nor *Terry v. Adams* [345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953)] contains any implication to the contrary. That Amendment prohibits only purposefully discriminatory denial or abridgement by government of the freedom to vote "on account of race, color, or previous condition of servitude." Having found that Negroes in Mobile "register and vote without hindrance," the District

Court and the Court of Appeals were in error in believing that the appellants invaded the protection of that Amendment in the present case.

*Id.* at 65, 100 S.Ct. at 1499, 64 L.Ed.2d at 57.

As to the fourteenth amendment, the court held that multimember districts, while not per se illegal, violate the fourteenth amendment if established with the invidious purpose or minimizing or cancelling out the voting potential of blacks. "To prove such a purpose it is not enough to show that the group allegedly discriminated against has not elected representatives in proportion to its numbers. A plaintiff must prove that the disputed plan was 'conceived or operated as [a] purposeful devic[e] to further racial discrimination." *Id.* at 66, 100 S.Ct. at 1500, 64 L.Ed.2d at 58 (brackets in original). Although disproportionate impact may provide a starting place, "where the character of a law is readily explainable on grounds apart from race, as would nearly always be true where, as here, an entire system of local governance is brought into question, disproportionate impact alone cannot be decisive, and courts must look to other evidence to support a finding of discriminatory purpose." *Id.* at 70, 100 S.Ct. at 1502, 64 L.Ed.2d at 60.

The district court opinion affirmed by the Court of Appeals was based on *Zimmer v. McKeithen*, 485 F.2d 1297 (5 Cir. 1973) (en banc), wherein the Fifth Circuit established:

> [W]here a minority can demonstrate a lack of access to the process of slating candidates, the unresponsiveness of legislators to their particularized interests, a tenuous state policy underlying the preference for multi-member or at-large districting, or that the existence of past discrimination in general precludes the effective participation in the election system, a strong case [of discrimination in use of at-large election systems] is made. Such proof is enhanced by a showing of the existence of large districts, majority vote requirements, anti-single shot voting provisions and the lack of provision for at-large candidates running from particular geographical subdistricts. The fact of

dilution is established upon proof of an aggregate of these factors.

*Id.* at 1305. In *Bolden*, the district court relied heavily on the fact that no black had ever been elected to the city commission and also on a finding that city officials had not been as responsive to the needs and interests of blacks as to whites. To prove discriminatory purpose according to the Supreme Court, however, there must be "more than intent as volition or intent as awareness of consequences.... It implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' and not merely 'in spite of,' its adverse effects upon an identifiable group." 446 U.S. at 71 n.17, 100 S.Ct. at 1502 n.17, 64 L.Ed.2d at 62 n.17.

The Supreme Court, disagreeing with the Fifth Circuit's conclusion that proof of an aggregate of the *Zimmer* criteria constitutes proof of discriminatory purpose, noted:

> Although the presence of the indicia relied on in Zimmer may afford some evidence of a discriminatory purpose, satisfaction of those criteria is not of itself sufficient proof of such a purpose. The so-called Zimmer criteria upon which the District Court and the Court of Appeals relied were most assuredly insufficient to prove an unconstitutionally discriminatory purpose in the present case.

*Id.* at 73, 100 S.Ct. at 1503, 64 L.Ed.2d at 62. The Court refuted the lower courts' reasoning as follows:

1. Since no obstacles existed in the way of blacks wishing to become candidates for office, the fact that no black had ever been elected to office was legally insignificant.

2. Although the district court found that commissioners had discriminated against blacks in employment and public services, that fact, while perhaps violative of the Constitution, would not justify revision of the city's form of government. The proper inquiry, said the Court, is on the state legislature's actions as evidence of intent. Thus, "the actions of unrelated governmental officials would be, of

course, of questionable relevance." *Id.* at 74 n.20, 100 S.Ct. at 1503 n.20, 64 L.Ed.2d at 63 n.20.

3. "[P]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful. The ultimate question remains whether a discriminatory intent has been proved in a given case. More distant instances of official discrimination in other cases are of limited help in resolving that question." *Id.* at 74, 100 S.Ct. at 1503, 64 L.Ed.2d at 63.

4. In short, the Court concluded that the mechanics of at-large systems of voting, naturally tending to disadvantage any voting minority, are insufficient to establish purposeful discrimination.

Justice Blackmun concurred in the opinion because, while he was of the view that the district court's findings would support an inference of purposeful discrimination, he deemed too drastic the remedy ordered by the district court for reorganizing the municipal government.

Justice Stevens, also concurring, stated that an at-large election system may violate both the fourteenth and fifteenth amendments but that the "proper test should focus on the objective effects of the political decision rather than the subjective motivation of the decisionmaker." *Id.* at 90, 100 S.Ct. at 1512, 64 L.Ed.2d at 73.

[I]n this case, if the commission form of government in Mobile were extraordinary, or if it were nothing more than a vestige of history, it would surely violate the Constitution. That conclusion would follow simply from its adverse impact on black voters plus the absence of any legitimate justification for the system, without reference to the subjective intent of the political body that has refused to alter it. Conversely, I am also persuaded that a political decision that affects group voting rights may be valid even if it can be proved that irrational or invidious factors have played some part in its enactment or retention.

*Id.* at 91, 100 S.Ct. at 1513, 64 L.Ed.2d at 73–74 (Stevens, J., concurring).

Justices Brennan and Marshall were of the view that discriminatory impact was sufficient under either the fourteenth or fifteenth amendments and that the lower courts should have been affirmed, and also agreed with Justice White that discriminatory purpose could be inferred from the totality of facts in the case.

In the first case after *Bolden* to reach the Fifth Circuit, *United States v. Uvalde Consolidated Independent School District*, 625 F.2d 547 (5 Cir. 1980), the court interpreted the various opinions in the case to indicate that the fourteenth and fifteenth amendments and § 2 of the Voting Rights Act are violated by the adoption or maintenance of at-large voting systems for a discriminatory purpose. Accordingly, the court reversed the district court's dismissal, for failure to state a claim upon which relief could be granted, of a complaint alleging that the use of at-large method of electing school board members was implemented with the purpose of injuring Mexican-American voters by precluding them from meaningful access to the political process.

In *McMillan v. Escambia County*, 638 F.2d 1239 (5 Cir. 1981), however, the Fifth Circuit held that "vote dilution violates only the Fourteenth Amendment" and that there is no cause of action under either the fifteenth amendment or § 2 of the Voting Rights Act. *Id.* at 1243 n.9. The court further held that proof of the *Zimmer* criteria could no longer support a finding of discriminatory intent, but that the focus should be on the factors enumerated in *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), described as follows:

(1) the historical background on the action, particularly if a series of actions have been taken for invidious purposes; (2) the specific sequence of events leading up to the challenged action; (3) any procedural departures from the normal procedural sequence; (4) any substantive departures from normal procedure, i.e., whether factors normally considered important by the decisionmaker strongly favor a decision contrary to the one

reached; and (5) the legislative history, especially where contemporary statements by members of the decisionmaking body exist. 638 F.2d at 1243. The court held that responsiveness of governing officials to the needs of black citizens is irrelevant to a determination of whether an at-large system is adopted or maintained with a discriminatory purpose. *Id.* at 1248–49 & n.18.

In *McMillan,* the district court held invalid the at-large systems for electing county commissioners, the school board, and the city council. On appeal, the Fifth Circuit reversed only as to the county commission, about which the Court of Appeals noted that it had previously held that Florida's constitutional amendment requiring at-large elections, enacted in the early 1900's, was not racially motivated. In addition, the court stated that since blacks did not represent a political threat at that time, having been effectively disenfranchised, the initial adoption of the at-large system was not done with discriminatory purpose. As to subsequent developments, the county commission had twice rejected recommendations of its charter government to change to single-member districts, but each commissioner testified that racial considerations played no role in his rejection of the proposal; furthermore, "the desire to retain one's incumbency unaccompanied by other evidence ought not to be equated with an intent to discriminate against blacks qua blacks." *Id.* at 1245. Since there was no evidence to contradict the commissioners' statements that their decision was not racially motivated, the Fifth Circuit held that the district court erred in disbelieving that testimony.

As to the school board, the court affirmed the decision that at-large elections were racially motivated. The court noted that school board elections had been from single-member districts for 44 years until 1947, following a court decision declaring unconstitutional the "white primary." In addition, evidence established that the legislature in 1975 retaliated against the school board's decision to support black interests on the question of whether the school nickname "Rebel" should be used by calling for

a referendum election to increase the size of the Board and reduce members' salaries, which referendum passed overwhelmingly. The court held that since an earlier referendum to the same effect failed miserably, and since the atmosphere at the time of the 1975 referendum was racially charged, the district court did not err in concluding that the referendum vote was racially motivated. *Id.* at 1247.

Regarding the city council elections, the court found sufficient evidence of discriminatory purpose, including testimony that the city council requested the legislature to change to at-large system so it "wouldn't have this hassle of reapportioning to keep so many blacks in this ward and so many whites in that ward and keep the population in balance as to race." Also, Governor Askew testified that he was aware that one council member wanted the change to at-large elections to avoid a "salt and pepper council." Furthermore, on the night before the referendum election, a newspaper editorial stated:

> One reason [for having council members elected at large] is that small groups which might dominate one ward could not choose a councilman. Thus, one ward might conceivably elect a Negro councilman though the city as a whole would not. This probably is the prime reason behind the proposed change.

The Fifth Circuit noted that "though not legislative history, editorials written contemporaneously with the action are probative evidence of the motivation of the action." *Id.* at 1248. A petition for certiorari filed in the Supreme Court was voluntarily dismissed by the parties. *City of Pensacola v. Jenkins,* 453 U.S. 946, 102 U.S. 17, 69 L.Ed.2d 1033 (1981).

Approximately one month after the *McMillan* decision, another Fifth Circuit panel decided two cases which somewhat conflict with *McMillan,* which was not cited in either opinion. In *Lodge v. Buxton,* 639 F.2d 1358 (5 Cir. 1981), *prob. jur. noted,* —— U.S. ——, 102 S.Ct. 86, 70 L.Ed.2d 80 (1981), Judge Fay, writing for himself and Judge Jones, affirmed a district court's con-

clusion that the Burke County, Georgia, system of electing at-large commissioners violated both the fourteenth and fifteenth amendments. Unlike the *McMillan* panel, the *Lodge* court found that a majority of Justices in *Bolden* were of the opinion that voter dilution may implicate the fifteenth as well as the fourteenth amendments even though the practices at issue may not directly affect access to the ballot. *Id.* at 1372–73. *Zimmer* and *Bolden* were reconciled as follows:

A cause of action under the Fourteenth or Fifteenth Amendment asserting unconstitutional vote dilution through the maintenance of an at-large electoral system is legally cognizable only if the allegedly injured group establishes that such system was created or maintained for *discriminatory purposes.* A discriminatory purpose may be inferred from the totality of circumstantial evidence. An essential element of a *prima facie* case is proof of unresponsiveness by the public body in question to the group claiming injury. Proof of unresponsiveness, alone, does not establish a *prima facie* case sufficient to shift the burden of proof to the party defending the constitutionality of the system; responsiveness is a determinative factor only in its absence. The *Zimmer* criteria may be indicative but not dispositive on the question of intent. Those factors are relevant only to the extent that they allow the trial court to draw an inference of intent. The *Zimmer* criteria are not the exclusive indicia of discriminatory purpose and, to the extent they are not factually relevant in a given case, they may be replaced or supplemented by more meaningful factors. Even if all of the *Zimmer* and other factors are established, an inference of discriminatory purpose is not necessarily to be drawn. The trial court must consider the totality of the circumstances and ultimately rule on the precise issue of discriminatory purpose. Finally, given the reality that each case represents an extremely unique factual context for decision, this Court will give great deference to the judgment of the trial court, which is in a far better position to evaluate the local political, social, and economic realities than is this Court.

*Id.* at 1375. (Emphasis in original). Thus, while endorsing a "totality of the circumstances" test, *Lodge* explicitly held that proof of unresponsiveness is essential and may not be replaced by other proof. *Id.* at n.35.

*Lodge* considered the following factors sufficient to establish discriminatory purpose:

1. Proof of unresponsiveness of county commissioners was shown by (a) allowing some blacks to be educated in largely segregated and inferior schools; (b) failing to hire more than a minimal number of blacks to county jobs, and paying those blacks lower salaries than white counterparts; (c) appointing very few blacks on county boards and committees; (d) failing to appoint any blacks to judicial selection committee; (e) failing to pave roads in black subdivisions; and (f) contributing to operation of a private school established to circumvent desegregation requirements. *Id.* at 1376–77.

2. Past discrimination against blacks was shown to impact on their present opportunities for effective participation in the electoral process by (a) the great increase in black voter registration as a result of the Voting Rights Act of 1965; (b) bloc voting along racial lines. In this regard, the court noted:

Of course, bloc voting is not illegal. Nonetheless, the Supreme Court and this court have repeatedly recognized that voting along racial lines enhances the likelihood that those seeking to manipulate the electoral system for discriminatory purposes will succeed. It is for that reason that the inquiry into voting patterns is relevant. Like unresponsiveness, it is a factor of greater significance in its absence. A plaintiff would be hard pressed to prove that a system was being maintained for invidious purposes, without proof of bloc voting. *Id.* at 1378 n.41.

(c) past and present inadequate and unequal educational opportunities; and (d) past and present official conduct making it more dif-

ficult for blacks to participate in Democratic primary system. Democratic primary was formerly a "white primary;" at the time of the decision only one of twenty-four members on Democratic Executive Committee was black. In addition, Georgia law required the individual serving as chief registrar in the county to own real property.

3. Depressed socio-economic condition of blacks as opposed to whites made it more difficult for them to effectively participate in electoral process, e.g., most blacks lived at poverty level; most black households lacked some plumbing facilities; more blacks were employed in menial jobs and therefore paid less than whites; and the quality and quantity of education for blacks was inferior to that provided white children.

4. Blacks had less access to political process because of inability to participate in Democratic party because of the failure to appoint blacks to governmental committees in meaningful numbers, and "the social reality that person-to-person relations, necessary to effective campaigning in a rural county, was virtually impossible on an interracial basis because of the deep-rooted discrimination by Whites against Blacks." *Id.* at 1379.

5. State policy behind at-large election system was found to have been subverted to invidious purposes because the policy was determined by the legislature, and Burke County's representatives had always been white.

6. The large size of the county (832 square miles) impaired access of blacks in electoral process.

7. Majority vote requirement and fact that candidates must run for specific seats had potential adverse effects. With regard to this, the district court found that "though there is no anti-single shot provision, the requirement that candidates run for numbered posts has potential effects that are equally adverse."

8. Although candidates must run for particular seat, there was no residency requirement and, therefore, all candidates could reside in all-white subdivisions.

The Court of Appeals found appropriate the relief ordered by the district court, i.e., that all county commissioners be elected from single-member districts in future elections.

Judge Henderson dissented, holding the view that the case should be remanded for reconsideration in light of *Bolden*, which came down after the district court's decision. Judge Henderson also criticized the majority's requirement for and emphasis on unresponsiveness as a necessary factor since the Supreme Court in *Bolden* stated that such proof is relevant as only tenuous and circumstantial evidence.

In *Thomasville Branch of NAACP v. Thomas County, Georgia*, 639 F.2d 1384 (5 Cir. 1981), the same Fifth Circuit panel reversed a district court's decision that the at-large electoral system in Thomas County did not violate the fourteenth or fifteenth amendments. Reversal was found to be necessary since the lower court interpreted *Bolden* to mean that proof of *Zimmer* criteria is not sufficient to allow an inference of discriminatory purpose. The Court of Appeals encouraged the district court to consider on remand depressed socio-economic conditions, the size of the county, history of bloc voting, anti-single shot provisions, requirements that candidates run from numbered posts, and majority vote requirements in primary elections. Judge Henderson dissented on the basis of *Bolden*.[4]

The case most factually similar to the one sub judice is *Kirksey v. City of Jackson*, 663 F.2d 659 (5 Cir. 1981), in which black citizens challenged the commission form of government adopted in 1912 in Jackson, Mississippi, after a 1977 defeat on a referendum proposing a change in the governmental system. There plaintiffs sought to establish racial motivation on the part of the electorate in defeating the 1977 referen-

**4.** We are advised that a stay of the *Thomas County* mandate has been ordered for unspecified reasons.

dum, but the district court held that "the motivation of the majority of the electorate who voted in the 1912 and 1977 referenda in question is not a proper inquiry." *Kirksey v. City of Jackson*, 506 F.Supp. 491, 500 (S.D.Miss.1981). Alternatively, however, the court found that the initial adoption of the municipal structure was not racially motivated, stating:

> Jackson's adoption of its present form of government in 1912 closely paralleled that of many other municipalities throughout the South and other parts of the nation and was brought about by the desire of the electorate to eliminate corruption, with no racial overtones or motivation. As previously stated, blacks had been virtually disenfranchised, and actually, at the time of the 1908 and 1912 referenda, had been completely excluded from participation in the Democratic Party primaries in Mississippi, which were tantamount to general elections. This fact, together with all of the other disenfranchising devices, had completely negated any racial motivation of the legislature in enacting the 1912 enabling legislation or the voters who voted for the change. Thus, this Court finds that race was not a motivating factor in the enactment of the legislation permitting the referendum of 1912 or the adoption of the commission form of government with at-large voting by the electorate of Jackson in 1912.

As to the question of whether the at-large system had been since maintained for the purpose of diluting black voting strength, District Judge Nixon first held that a violation of the fifteenth amendment or of § 2 of the Voting Rights Act had not been shown since "Negroes in Jackson register and vote without hindrance" and since "the decision to adopt and maintain the commission form of government is a political decision that is supported by valid and articulable justification inasmuch as its basic election system is the same as that followed by literally thousands of municipalities and other governmental units throughout the nation." *Id.* at 505. The court next concluded that a fourteenth amendment violation had not been proved since if race

were a factor in the 1977 referendum, it played only an insignificant part, and the referendum would have failed even if race had not been considered by the electorate.

The district court's opinion was affirmed on appeal, the Fifth Circuit holding:

> We agree with the district court that the voters in the 1912 and 1977 referendums were free to vote however they saw fit, for whatever reasons they wished. Yet, even should we conclude otherwise, we agree with the district court that the record in this case does not demonstrate racially discriminatory purpose either in the establishment or in the maintaining of Jackson's mayor-commission form of government.

On petition for rehearing and denial of rehearing en banc, the court "clarified" its opinion as follows:

> In their application for rehearing, appellants challenge our decision on the question of judicial inquiry into the motivation of the voters in the referendum election. Our opinion, 663 F.2d 659 (5th Cir.) holds that an individual voter may not be subjected to judicial examination concerning how he voted or why he personally voted in that fashion. We affirm that conclusion. However, we specially note that our decision is not to be misunderstood as holding or suggesting that, in a proper case, the motivation of the electorate may not be examined by the introduction of either direct or circumstantial evidence. The latter inquiry may be a proper inquiry. The referendum process may not be used to legitimate an unconstitutional act. *See Hunter v. Erickson*, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969); *Reitman v. Mulkey*, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967); *Lucas v. Colorado General Assembly*, 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964). The record in the case before us does not establish that type of abuse of the electoral process.

*Kirksey v. City of Jackson*, 669 F.2d 316 (5th Cir., 1982).

■ Our understanding of the foregoing decisions constrains us to conclude that, to

prevail on a claim of denial or abridgement of the right to vote safeguarded by § 2 of the Voting Rights Act and the fifteenth amendment, or a claim of dilution of black voting strength under the fourteenth (or fifteenth) amendment, plaintiffs have the burden of proving purposeful discrimination. This can be accomplished in this case by direct or circumstantial evidence that would justify the conclusion that the decision-makers, whether legislators, elected city officials, or others representing the state or the City of Greenwood, selected or maintained the commission form of government "at least in part 'because of' and not merely 'in spite of' its adverse effect upon an identifiable group [blacks]." *Bolden, supra*, 446 U.S. at 71 n.17, 100 S.Ct. at 1502 n.17, 64 L.Ed.2d at 61–62 n.17.

█ Initially we hold that blacks of voting age in Greenwood register and vote freely, without hindrance, interference or impediment of any kind, and plaintiffs' claims based upon § 2 of the Voting Rights Act and the fifteenth amendment as to alleged denial or abridgement of the right to vote may not be sustained. Similarly, the court finds no merit in plaintiffs' contention that the commission form of government constitutes a "badge of slavery" to black citizens violative of the thirteenth amendment, and that claim, too, is summarily rejected. Plaintiffs' contention that the commission form of government impermissibly dilutes or cancels black voting strength contrary to the Equal Protection Clause of the fourteenth amendment as well as the spirit, if not the letter, of the fifteenth amendment requires detailed discussion.

Plaintiffs urge that the passage of Chapter 120, Mississippi Laws of 1912 (now codified as Miss.Code Ann. § 21–5–1 (1972)) by the Mississippi legislature permissively authorizing but not mandating the commission form of government for cities in the state was itself racially motivated and is therefore an unconstitutional attempt to dilute or cancel black voting strength. This argument must be rejected for several reasons. First, on the facts found and which are indisputably correct, blacks in 1912, and prior thereto, were largely disenfranchised throughout the state and had only limited access to the polls, and they were not affected significantly, if at all, by the at-large voting system which the legislature contemplated for the commission form of government. Plaintiffs offered no persuasive evidence of legislative intent that the statute was passed to effect a racially discriminatory method of electing city officials. On the contrary, the record supports a finding that by adopting the 1912 statute, the legislature acted in line with reforms embraced within the progressive movement then spreading throughout the United States. The objective, non-discriminatory character of that movement is well documented.

It is noteworthy that a system of at-large city elections in place of elections of city officials by the voters of small geographic wards was universally heralded not many years ago as a praiseworthy and progressive reform of corrupt municipal governments. *Bolden, supra*, at 70, n.15, 100 S.Ct. at 1502 n.15, 64 L.Ed.2d at 60–61 n.15. Political scientists have generally agreed that the progressive movement, including advocacy of the commission form of city government, was not racially motivated or aimed at disenfranchising minority groups, but was intended to eliminate evils that developed in many cities from use of the ward method of electing officials. We therefore conclude that the commission form of government authorized in 1912 by the Mississippi Legislature was not conceived by state lawmakers as "a purposeful device to further racial discrimination," but instead was designed to provide an opportunity for cities to enhance the efficiency of their governments, subject to approval of local electorates.

Our next inquiry concerns the legality of Greenwood's 1914 referendum which established the commission form of government and the 1977 referendum reaffirming continued use of that system. As for the original referendum plaintiffs produced no direct evidence of racial motivation in what was an all-white election, and relied upon contemporaneous newspaper articles claimed to have racial connotation. As heretofore found, however, these articles were unrelated to a potential threat of

black voting in Greenwood elections and are not probative of a motivation to discriminate. The largely undisputed evidence is that the primary advocates of the commission form of government in the 1914 referendum were Greenwood businessmen who successfully urged the voters to adopt the plan for economic reasons. No reasonable inference can be drawn from the sketchy evidence that race might have been a factor in the adoption of the commission plan. Plaintiffs' assertion that the 1914 referendum should nevertheless be invalidated because blacks were then effectively disenfranchised and could not participate in it ignores the fact that Mississippi's voting requirements in effect in 1914 were constitutional in every respect under controlling decisions of the United States Supreme Court. We decline the invitation to invalidate an election 68 years after its occurrence on the basis of subsequent changes in federal statutory and constitutional law.

The court next considers the 1977 referendum in which the change to a mayor-council form of government with at-ward elections was overwhelmingly defeated. Plaintiffs assert that this outcome of the referendum evidences an intent to dilute black voting strength by maintaining an at-large election system in which black candidates for municipal office have invariably been defeated. Although the pros and cons of the change to a system with at-ward elections were vigorously debated throughout the community, the incumbent mayor and commissioners, two of whom had only recently assumed office with the public endorsement of GVL, took no official position on the question. Though no doubt interested in retaining their newly acquired incumbency, the elected city officials played no role in the campaign that preceded the referendum election beyond an expression by Commissioner Bass of a personal preference for the commission form of government. Thus, the record is "devoid of any proof linking a racial reason to the opposition of any person acting on behalf of the [City]." *Kirksey, supra,* at 664. The attempt by plaintiffs to attribute the views of Hite McLean and Hardy Lott to the City is without factual support, and we decline to infer

that they spoke with authority from the City or its elected officials. Neither can the motivations of the electorate, whatever their reasons for defeating the referendum, fairly be attributable to the defendant officials.

Plaintiffs nevertheless urge that there is circumstantial evidence of racial motivation in the results of the referendum because retention of the commission form was approved by almost a three to one majority of the electorate that was heavily contributed to by votes cast by the all-white North Greenwood ward. It is impossible for us to determine with any reasonable degree of certainty the reason or reasons for the defeat of the proposed change. The total voter turnout for the referendum was low compared to candidate elections prior and subsequent to the 1977 referendum. For example, while only 3,835 voters cast ballots in the referendum, 4,797 voted in the 1977 Democratic primary election for mayor. Significantly, so few voters—1,069—cast votes in favor of change to so many more voters—2,186—who signed the petition requesting the referendum. This substantial loss of support for the proposal may be attributed to apathy or disinterest, satisfaction with newly elected officials, or a desire to maintain the status quo. It is certainly clear that neither blacks nor any other segment of the voting population were denied the opportunity to vote in the election and that had the petition signers and 581 additional voters cast ballots in favor of the proposed change, it would have been adopted. It appears, however, that after soliciting the requisite number of names to petition for a referendum, the proponents of the change failed to go forward and insure that the supporters would vote in the 1977 referendum. Thus, to grant plaintiffs the relief they request would mean that when faced with important elections, minority citizens could simply choose not to vote, and then challenge the election on the ground that whites who did vote defeated the proposal.

The record reveals that a campaign for and against the proposed change was prominently featured in the Greenwood newspaper, with known personalities taking sides

on the issue, and it is reasonable to believe that these articles were read by many Greenwood voters. It is equally clear that the arguments raised by Jordan and Editor Emmerich favoring change and Attorneys McLean and Lott opposing change interjected race as one of the considerations to support their respective positions. In fact, the mention of race as a factor was first raised by the proponents for change, which was responded to in kind by leading opponents. The extent to which any argument, whether nonracial or otherwise, might have influenced or altered the opinion of anyone voting in the election is not only unknown but unknowable, and a conclusion that persons were or were not influenced by such adversarial expressions appearing in the newspapers would be mere surmise. Moreover, any inquiry into the motivation of individual voters who may have voted either for or against the proposed change is repugnant to our constitutional system. As stated in *Kirksey*:

> The first amendment assures every citizen the right to "cast his vote for whatever reason he pleases. . . ." *Anderson v. Martin*, 375 U.S. 399, 402, 84 S.Ct. 454, 455, 11 L.Ed.2d 430 (1964). Baser motives are protected along with the grand and noble. Stigmatized racial attitudes, neither socially admirable nor civically attuned, are not constitutionally proscribed. . . . In the instant case, the Mississippi Legislature enacted legislation permitting the electorate of Jackson to determine, by referendum, their form of city government. No basis exists for suggesting an impermissible motive in the structuring of the city system. That decision was deferred to the electorate of Jackson. The motivation(s) of the individual voters may not be subjected to the searching juridical inquiry the plaintiffs wish performed.
>
> We agree with the district court that the voters in the 1912 and 1977 referendums were free to vote however they saw fit, for whatever reasons they wished.

*Kirksey, supra*, at 662.

To allow inquiry into voters' motivations would open the door to endless challenges to all types of elections.

Where it occurs, voting for or against a candidate because of his race is an unfortunate practice. But it is not rare; and in any district where it regularly happens, it is unlikely that any candidate will be elected who is a member of the race that is in the minority in that district. However disagreeable this result may be, there is no authority that the candidates who are found racially unacceptable by the majority, and the minority voters supporting those candidates, have had their Fourteenth or Fifteenth Amendment rights infringed by this process. Their position is similar to that of the Democratic or Republican minority that is submerged year after year by the adherents to the majority party who tend to vote a straight party line.

*United Jewish Organizations v. Carey*, 430 U.S. 144, 166–67, 97 S.Ct. 996, 1010, 51 L.Ed.2d 229, 246–47 (1977).

It is of course true that electorate's motivations are not immune from inquiry in proper cases. *See Hunter v. Erickson*, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969); *Reitman v. Mulkey*, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967); *Lucas v. Colorado General Assembly*, 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964). Each of those decisions, however, involved an attempt to circumvent constitutional mandates by local option. That is not the case here. At-large elections are not proscribed by the United States Constitution. Rather, under our reading of controlling precedent, a system for holding elections is invalid only if it was adopted or maintained by government officials for an invidious purpose. "And the record here would not support any claim that a law seemingly neutral on its face is in fact aimed at racial minority." *James v. Valtiera*, 402 U.S. 137, 141, 91 S.Ct. 1331, 1333, 28 L.Ed.2d 678, 682 (1971). We are unwilling, as were the Supreme Court in *James* and the Fifth Circuit in *Kirksey* to extend decisions allowing inquiry into voters' motivation to the case sub judice.

In summary, we hold that the 1912 legislative enactment authorizing the commis-

sion form of government was not motivated by racial considerations; that the 1914 Greenwood referendum establishing that form of government was passed for objective, nondiscriminatory reasons; and that the 1977 referendum retaining the commission form of government was decided by vote of the electorate after nonracial as well as racial appeals were made by proponents and opponents alike so that the extent to which race significantly affected the outcome cannot be determined except by impermissible inquiry into the motivation of individual voters who participated in the election. Moreover, the court finds that the elected city officials in Greenwood are and have been responsible to the black community as much as to the white citizenry, and the City officials have not sought to maintain the commission form of government to discriminate against blacks. Under controlling case law, plaintiffs have failed to carry the burden of proving that the commission form of government in Greenwood is violative of federal constitutional or statutory rights.

Let an order issue accordingly.