David JORDAN, James Moore, Robert
Sims, and Sammie Lee
Chestnut, Plaintiffs,

v.

CITY OF GREENWOOD, MISSISSIPPI;
Clay Ewing, Mayor, Sam Bass, Com-
missioner, and Charlie Wright, Com-
missioner, individually and in their of-
ficial capacities as Members of the City
Council of the City of Greenwood, City
of Greenwood Municipal Democratic
Executive Committee; G. Hite McLean,
Chairman of the City Democratic Exec-
utive Committee; City of Greenwood
Municipal Republican Executive Com-
mittee; Porter Peteet, Chairman of the
City Republican Executive Committee;
City of Greenwood Municipal Election
Commission; Ms. A.J. Brewerton, Ms.
A.C. Snellings, and Ms. Frances Tupper,
Members of the City Election Commis-
sion, Defendants.

Civ. A. No. GC77–52–WK–P.

United States District Court,
N.D. Mississippi,
Greenville Division.

July 25, 1984.

Willie J. Perkins, North MS Rural Legal Services, Greenwood, Miss., for plaintiffs.

Steven H. Rosenbaum, Voting Rights Sec., U.S. Dept. of Justice, Washington, D.C., for plaintiff-intervenor.

Billy B. Bowman, Brewer, Deaton & Bowman, Greenwood, Miss., for defendants.

## MEMORANDUM OF DECISION

KEADY, District Judge.

This action on behalf of black residents of the City of Greenwood, Mississippi, challenging the city's at-large commission form of government is before the court on remand from the Court of Appeals vacating the prior judgment of the district court entered March 23, 1982, *Jordan v. City of Greenwood*, 534 F.Supp. 1351. The cause was remanded for further consideration in light of Section 2 of the Voting Rights Act of 1965 as amended in 1982, 42 U.S.C.

§ 1973 (Supp.1984); *Jordan v. City of Greenwood*, 711 F.2d 667 (5th Cir.1983).

Following a status conference held after remand of the case, the United States, on December 28, 1983, was permitted to intervene as a plaintiff to address the single issue of whether Greenwood's at-large election of commissioners violates amended Section 2. Both the Government and private plaintiffs contend that the election system is unlawful since under the "results" test of the amendment black voters are denied equal access to the political process and to elect representatives of their choice. After the close of discovery on February 10, 1984, defendants decided not to contest the issue, but were unwilling to concede liability. In June 1984, the parties filed a lengthy Stipulation of Facts (hereinafter "Stip.") that supplements the record from the first trial. The parties have agreed to forego an evidentiary hearing and submit the case for decision upon the previous record and the additional stipulations.

▆▆▆ Prior to June 29, 1982, amendment to Section 2 of the Voting Rights Act,[1] plaintiffs, claiming that an at-large election system unlawfully diluted minority voting strength in violation of the Voting Rights Act, had to prove purposeful discrimination in the adoption or maintenance of the challenged system, *City of Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). In March 1982, this court held that plaintiffs had failed to establish that Greenwood's at-large election scheme had been adopted or maintained for racially discriminatory reasons. By the

---

1. The amendment reads as follows:

    (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in Section 4(f)(2), as provided in subsection (b).

    (b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivisions are not equally open

to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

Pub.L. No. 97–205, § 3, 96 Stat. 131, 134, codified at 42 U.S.C. § 1973 (Supp.1984).

June 1982 amendment, Congress specifically rejected *Bolden*'s intent standard and eliminated the requirement that Section 2 plaintiffs demonstrate purposeful discrimination, S.Rep. No. 417, 97th Cong., 2d Sess. 16, 27–30, *reprinted in* 1982 U.S.Code Cong. & Ad.News 177, 193, 204–07. Instead Congress restored the pre-*Bolden* "results" standard as enunciated in *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), and subsequent cases including *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir.1973) (*en banc*), *aff'd on other grounds sub nom. East Carroll Parish School Board v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976); S.Rep. No. 417, *supra* at 27–30, 32. The "results" test focuses judicial inquiry on objective factors concerning the "totality of the circumstances" bearing on the present ability of minorities to participate effectively in the political process, rather than upon the motivation of lawmakers in enacting or maintaining the challenged practice.

The Senate Report identifies the following factors as relevant to the Section 2 "totality of circumstances" inquiry:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

While these enumerated factors will often be the most relevant ones, in some cases other factors will be indicative of the alleged dilution.

S.Rep. No. 417, *supra*, at 28–29, U.S.Code Cong. & Admin.News 1982, pp. 205, 206 (footnotes omitted).

Congress did not intend these factors "to be used ... as a mechanical 'point counting' device." S.Rep. No. 417, *supra*, at 29, n. 118, U.S.Code Cong. & Admin.News 1982, p. 206. Nor is there a requirement "that any particular number of factors be proved, or that a majority of them point one way or the other." *Id.* at 29 U.S.Code Cong. & Admin.News 1982, p. 206, (footnote omitted). Rather, evidence about these and other relevant factors is intended as a guide for the court's exercise of its judgment about whether "the electoral system, in light of its present effects and historical context, treats minorities so unfairly that they effectively lose access to the political processes." *Jones v. City of Lubbock*, 727 F.2d 364, 384–85 (5th Cir. 1984); *see United States v. Marengo County Commission*, 731 F.2d 1546 (11th Cir.1984).

Although the "results" test under Section 2 is based on the legal standard existing before the Supreme Court's decision in *City of Mobile v. Bolden, supra,* the Fifth Circuit has noted a "subtle change in emphasis" in the statutory enactment:

First, Congress not only failed to follow *Zimmer's* distinction between primary and enhancing factors, but also relegated two primary factors—unresponsiveness and tenuousness—to secondary importance. Second, Congress has articulated as an objective factor an evidentiary issue—polarized voting—that this court's pre-*Bolden* cases had not treated as a matter of primary importance.

*Jones v. City of Lubbock, supra,* 727 F.2d at 384.

■ The effect of these "subtle changes in emphasis" are relevant to the case at bar. At the time this court decided this case, the law in this circuit required plaintiff to prove unresponsiveness in order to prevail in a vote dilution case. 534 F.Supp. at 1362; *Lodge v. Buxton,* 639 F.2d 1358, 1375, n. 35 (5th Cir.1981), *aff'd on other grounds sub nom. Rogers v. Lodge,* 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982). Now proof of unresponsiveness is not essential to a claim of intentional discrimination under the Constitution, *Rogers, supra,* 458 U.S. at 625 n. 9, 102 S.Ct. at 3280 n. 9, and is of only "secondary importance" to a claim under the "results" test of Section 2. Indeed, under Section 2 defendant's evidence of responsiveness is only relevant as rebuttal evidence should plaintiff first offer evidence of unresponsiveness. S.Rep. No. 417, *supra,* at 29, n. 116. In *Jones v. City of Lubbock,* the court of appeals affirmed a finding of a Section 2 violation even though defendants had been responsive.[2] Thus, this court's finding of responsiveness, 534 F.Supp. at 1357–58, by itself, no longer would support a judgment for defendants.

The elimination of the "intent" requirement of amended Section 2 is constitutional. *Jones v. City of Lubbock,* 727 F.2d at 373–75; *accord United States v. Marengo County Commission,* 731 F.2d at 1562–63.

Our task, therefore, is to determine whether the evidence establishes that the above-mentioned objective factors as they may bear on the totality of circumstances invalidate Greenwood's at-large election system.

### A. Background

Since March 16, 1914, Greenwood, the county seat of Leflore County, Mississippi, has been governed by a three-member city council that operates as a commission form of government. The council is comprised of a mayor and two commissioners who serve concurrent, four-year terms. The commissioners are elected from numbered posts and there is no subdistrict residency requirement. Under state law, a majority vote requirement applies to political party primaries, Miss.Code Ann. § 23–3–69 (1972), and special elections to fill vacancies, Miss.Code Ann. § 23–5–203 (1972). On September 6, 1977, a proposal to change the commission form of government to one composed of a mayor and seven councilmen, the latter to be elected from wards, was defeated in a referendum submitted to the electorate. No black person has ever been elected to serve on Greenwood's city council, although several have run for office.

Greenwood's 1980 population was 20,115, of whom 10,460 (52.0%) were black. Blacks, however, were a minority of the voting age population (46.2%) and the registered voters (44% at the last municipal election). Stip. ¶ 4, Ex. 1 at 3.

### B. History of racial discrimination and its present day effects

As this court has heretofore found, it is well documented that a pattern of racial discrimination in the past has existed in Leflore County, Greenwood, and Mississip-

---

**2.** The court of appeals ruled further that evidence of responsiveness does not overcome evidence of racially polarized voting. The court reasoned that "[w]hether or not city officials do

ignore minority interests, polarization nevertheless frees them of political reprisal for disadvantaging the minority community." 727 F.2d at 381.

pi. Prior to the passage of the Voting Rights Act of 1965, blacks in Mississippi were effectively disenfranchised through the use of poll taxes, literacy tests and the like. 534 F.Supp. at 1357. This documentation not only touched the rights of blacks to register, to vote and otherwise to participate in the political process but also extended to racial discrimination in education, employment, public facilities, housing, public accommodations, and the provision of governmental services. Stip. ¶ 3. In 1964, only 2.1% of the non-white voting age population was registered to vote, in contrast to 71.5% of the registered white voting age population. Stip. ¶ 10. Since the passage of the Voting Rights Act, the Attorney General has sent examiners to register voters in Greenwood and Leflore County and observers to monitor elections in Leflore County. All told, about 25% of the registered voters in Greenwood were registered by federal examiners. Stip. ¶ 13, Ex. 1 at 4. Although the black voter registration rate has increased substantially since 1964, the black registration rate is still lower than the white registration rate. As of 1983, 71% of Greenwood's voting age blacks were registered for municipal elections compared to 80% of Greenwood's voting age whites. Stip. ¶ 9. Also, the City of Greenwood acted contrary to Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, by implementing two annexations (in 1967 and 1979) without obtaining preclearance. Stip. ¶ 19. These areas contained a virtually all white population and have been included in municipal elections. When the city on March 15, 1984, submitted the two annexations to the Attorney General for review, the Attorney General interposed an objection on May 14, 1984, on the ground that "racial bloc voting exists in the city and that the addition of 1,059 whites and 64 blacks ... reduces by 2.7% a black voting strength which, in the absence of the an-

nexations, likely would be approaching 50% of the City of Greenwood." Stip. ¶¶ 19, 20, Ex. 6.

Greenwood's black citizens continue to suffer the consequences of racial discrimination. Socioeconomic data show that blacks are substantially disadvantaged compared to whites in education, income, poverty status, employment, living conditions, and health.[3] Stip. ¶¶ 16-18. These disadvantages have contributed to decrease black political participation in Greenwood and make that participation less effective. Stip. Ex. 1, 2, 5(E). For example, the statistics on voter participation in municipal elections (1969-1983) establish that 42%-45% of the whites voted, in contrast to the mean black voter turnout of 11.4% in elections without black candidates and 23.5% in elections with black candidates.

■ Under Section 2, where blacks have a lower socioeconomic status than whites and where black political participation is depressed, as is true in Greenwood, "plaintiffs need not prove any further causal nexus between the disparate socioeconomic status and the depressed level of political participation." S.Rep. No. 417, *supra* at 29 n. 114, U.S.Code Cong. & Admin.News 1982, p. 206. *See Jones v. City of Lubbock, supra* at 383; *Cross v. Baxter,* 604 F.2d 875, 880 (5th Cir.1979); *Kirksey v. Board of Supervisors,* 554 F.2d 139, 143-44 (5th Cir.1977).

### C. *The extent to which voting in Greenwood is racially polarized*

The City of Greenwood is divided into three wards or precincts: East Greenwood which is predominantly black, North Greenwood which is virtually all white, and West Greenwood which is a mixed neighborhood. Voting in Greenwood's elections has been predominantly along racial lines. 534

---

**3.** According to the 1980 census, only 24.9% of Greenwood's blacks, 25 years and older, have completed high school compared to 68.5% of the whites, 25 years and older. In 1979, 46.1% of the black families in Greenwood were living below the poverty level compared to 7.1% of the white families. The mean income of white fam-

ilies was $23,283, more than twice as high as the black mean ($9,148). The 1980 census shows that the black unemployment rate (15.7%) in Greenwood was nearly six times greater than the white unemployment rate (2.7%). Black infant mortality is much higher than it is for whites.

F.Supp. at 1354. In the 1969 and 1981 municipal elections, five black candidates unsuccessfully ran for city council.[4] Professor Allan J. Lichtman, of American University of Washington, D.C., an expert in the history of voting and the methodology for inferring voter behavior from election returns and demographic information, has analyzed each city council contest since 1969 and confirms our prior finding that "none of the black candidates in any general election or primary have received more than relatively few of the votes cast in the [virtually all white] North Greenwood ward."[5] No black candidate for municipal office has received more than 2.3% of the North Greenwood vote, with the mean support for black candidates in that precinct being 1.1%. In contrast, support for the black candidates in the preponderantly black East Greenwood precinct has been high, with the average black candidate receiving 76.5% of the vote. Stip.Ex. 5(D). The unchallenged expert opinion, based upon statistical evidence, shows an extraordinarily high level of racial bloc voting, with little crossover voting of whites for black candidates or of blacks for white candidates. The same pattern apparently held true for the 1977 referendum on changing Greenwood's commission form of government to a mayor-council form, when voting was predominantly along racial lines with blacks voting for the change and whites against it. 534 F.Supp. at 1354.

It is incontrovertible that since 1969 black candidates, although supported overwhelmingly by Greenwood's black voters, have been, without exception, rejected by white voters. The extraordinarily high degree of racial bloc voting practically assures the defeat of black candidates in at-large elections.

**4.** Black candidates ran as independents in the 1969 and 1973 general elections and in the Democratic party primary in 1981. There were no black candidates in 1977. Stip. Ex. 3. The results of these and other races are set out in the court's prior opinion and need not be repeated here.

**5.** Although Greenwood does not maintain voter registration by race, the parties agree that

**D.** *The extent to which Greenwood has unusually large election districts and other voting practices that may enhance the chance for discrimination*

1. *Unusually large election districts.* According to the 1980 census, Greenwood is the fifteenth largest city in population in Mississippi. Since whites, as the political majority, are able to elect all members of the city council, an election district encompassing the entire city tends to minimize the voting strength of minority groups. *Rogers v. Lodge,* 458 U.S. 613, 616, 102 S.Ct. 3272, 3275, 73 L.Ed.2d 1012.

2. *Majority vote requirement.* State law applicable to Greenwood's elections requires that to win a party nomination or to win a special election to fill a vacancy in office, candidates must receive a majority of the votes cast. There can be little doubt that the majority system tends to strengthen the ability of the majority to submerge a racial minority in a multi-member district. *Rogers,* 458 U.S. at 627, 102 S.Ct. at 3280.

3. *Anti-single shot provision.* Greenwood's numbered post requirement and Mississippi's full slate law, Miss.Code Ann. § 21–11–15 (1972), minimize black voting strength by requiring candidates in municipal elections to run for designated seats and electors must vote on each seat separately. A numbered post requirement "enhances the [minority's] lack of access because it prevents a cohesive political group from concentrating on a single candidate." *Rogers,* 458 U.S. at 627, 102 S.Ct. at 3281.

4. *Lack of a subdistrict residency requirement.* There is no requirement that candidates for municipal office in Greenwood live in any particular section of the city. Miss.Code Ann. § 21–5–5 (1972). The

through statistical techniques reliable estimates of the racial composition of the voters may be ascertained. The number of registered voters is detailed by precinct for each municipal election in Greenwood since 1965 together with the estimated racial composition of the registered voters and the registration rates of whites and blacks since 1969. Stip. ¶ 8, Ex. 1.

lack of a residency requirement where housing patterns are racially segregated means that all elected officials may reside in Greenwood's white neighborhoods. *Rogers*, 458 U.S. at 627, 102 S.Ct. at 3280.

On the other hand, the evidence establishes that the black population of Greenwood is sufficiently numerous and concentrated in areas of the city that, if members of the city council were elected from single-member districts, blacks would be in a voting majority in some districts and would have a reasonable opportunity to elect candidates of their choice. Stip. ¶ 25.

5. *The extent to which there is a candidate slating process in Greenwood.* There exists no slating process of candidates, and blacks are as free as whites to announce, qualify, and run as candidates in party primaries and general elections. The failure of black candidates in 1981 to gain the Democratic party primary nomination is not sufficient to justify a conclusion of discriminatory slating.

6. *The extent to which political campaigns have been characterized by overt or subtle racial appeals.* Although there is no direct evidence of racial appeals in past political campaigns other than that in the 1977 referendum, it is reasonable to infer that such appeals are tacitly, if not openly made; black candidates have clearly been the choice of the black community and white candidates the overwhelming choice of the white community. Racial considerations prominently surfaced in the 1977 referendum campaign, when subtle racial appeals urged voters to vote for or against the change.[6]

7. *The extent to which members of minority groups have been elected to public office.* As stated, no black has been elected to a seat on the Greenwood city council. This is a circumstance that amended Section 2 expressly states is significant in determining whether minorities have less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice. The failure of any black candidate to win an election under an at-large system, where racial bloc voting is shown to prevail, is strong evidence that the political processes leading to nomination or election in Greenwood are not equally open to participation by black citizens.

8. *Responsiveness of elected officials to particularized needs of the black community; tenuousness of state policies favoring at-large elections.* Both the Government and the private plaintiffs challenge our prior finding of responsiveness of Greenwood's elected officials to the special needs of the black citizens. They argue that the city has taken action to remove past discrimination in provisions for municipal services and employment only after litigation in federal court and that public housing projects sponsored by the city were accomplished by federal funds. They also assert that the representation of blacks on city boards and commissions, non-existent until 1970, has been inadequate and disproportionately low. They further emphasize that the city officials violated Section 5 of the Voting Rights Act by implementing voting changes after making two annexations without obtaining Section 5 preclearance, and which the Attorney General has determined to be dilutive of minority voting strength. Unquestionably, these arguments weaken the city's case for current responsiveness, particularly in light of the Fifth Circuit ruling in *Jones v. City of Lubbock*, where the court observed that a city's "action taken during the course of litigation in which the degree of responsiveness has been an important evidentiary issue cannot be decisive of past and future conduct by [the municipality];" and that city officials "cannot take credit entirely for the provision of ... services [when] the funds for these are derived largely from federal programs aimed at economically depressed areas." 727 F.2d at 382. Notwithstanding these arguments, the court is un-

---

6. Racial appeals to the voters appeared in local newspaper articles by white leaders of a group known as "Citizens for our Present Form of Government," and by the black president of the Greenwood Voters League. Statements of opponents and proponents of the change are set forth in the prior opinion, 534 F.Supp. at 1354–56, and need not be repeated here.

persuaded that the Greenwood city council is currently unresponsive to the special needs of black citizens. It is unnecessary, however, to dwell on this point since proof of unresponsiveness is not an essential element to make out a case under amended Section 2.

There is no state policy favoring at-large elections of city council members, and only a few cities in Mississippi currently operate under a commission form of government. Most Mississippi cities with populations over 10,000 elect their city councils by district, Stip. ¶ 26; hence, the policy for Greenwood's at-large electoral scheme must be regarded as tenuous.

█ In sum, the court is of the firm opinion that the evidence establishes almost every element of proof delineated by Congress as probative of a Section 2 violation, and from a totality of the circumstances, it is inescapably clear that the black voters of Greenwood have less opportunity than whites to participate in the political process and to elect representatives of their choice. This result is compelled by evidence no less convincing than the record upon which Hattiesburg's commission form of government was struck down as violative of Section 2 by United States Magistrate John M. Roper of the United States District Court for the Southern District of Mississippi in *Boykins v. City of Hattiesburg*, No. H–77–0062(C), slip op. (S.D.Miss. Feb. 29, 1984). The court therefore must require the establishment of single-member districts for the City of Greenwood.

Since Mississippi law provides for several forms of city government that do not require at-large election systems, the defendant mayor and commissioners shall have the responsibility of submitting to the court a proposal for the election of council members other than the mayor by wards. Since the new plan must be in place in time for the 1985 municipal elections, defendants' proposal setting forth the number and boundaries of each ward, with the total population and voting age population by race assigned to each ward, shall be filed in court not later than November 1, 1984. Defendants, or their representatives, shall promptly confer with counsel for private plaintiffs and the United States with a view of presenting a mutually acceptable plan that complies with federal law. In this respect, it is essential that the new plan of city government be subject to preclearance by the Attorney General under Section 5 of the Voting Rights Act both to correct the city's failure to obtain preclearance of the two prior annexations as well as to secure approval of the new plan for the entire city. In case of disagreement, whether in whole or in part, private plaintiffs and/or the United States shall submit their objections in writing not later than December 1, 1984, together with alternate proposals. The parties are admonished that the interests of the City of Greenwood and its citizens will be best served by reconcilement of differing views as to the number and structure of the wards and thereby avoiding prolonged and costly litigation.

## JUDGMENT

Pursuant to Memorandum of Decision this date released, it is

**ORDERED:**

1. The City of Greenwood's commission form of government with three council members elected at large violates Section 2 of the Voting Rights Act of 1965, as amended in 1982, 42 U.S.C. § 1973 (Supp. 1983).

2. The defendants are hereby **ENJOINED** from further conducting political party primaries and general elections in the City of Greenwood of city council members on an at-large basis.

3. The defendant mayor and commissioners shall, not later than November 1, 1984, file with the court a proposal for the election of council members other than the mayor by single districts or wards, setting forth the number and boundaries of each ward and the total population and voting age population by race assigned to each ward. A copy of such plan shall be served upon counsel for private plaintiffs and the United States. Such plan must comport with federal constitutional and statutory law that satisfies the one-person, one-vote principle, avoids the dilution of minority

voting strength, and provides equal access to the political process by black voters. The defendant mayor and commissioners, or their representatives, shall promptly confer with counsel for private plaintiffs and the United States with a view to reaching agreement, bearing in mind the necessity for preclearing under Section 5 of the Voting Rights Act two prior municipal annexations as well as the new electoral plan for the entire city. In case of disagreement, whether in whole or in part, private plaintiffs and/or the United States shall file with the court written objections not later than December 1, 1984, together with alternate proposals, with copy to be served upon counsel for defendants. If necessary, the court will thereafter schedule an evidentiary hearing as expeditiously as possible to resolve the issue.