**MISSISSIPPI STATE CHAPTER, OPERATION PUSH, INC., et al., Plaintiffs–Appellants, Cross–Appellees,**

v.

**Ray MABUS, Governor of Mississippi, et al., Defendants–Appellees, Cross–Appellants.**

No. 89–4627.

United States Court of Appeals, Fifth Circuit.

May 31, 1991.

Rehearing Denied July 19, 1991.

Frank R. Parker, Lawyers' Committee for Civil Rights Under Law, Washington, D.C., for plaintiffs-appellants, cross-appellees.

W.O. Luckett, Jr., Michael T. Lewis, Luckett Law Firm, Clarksdale, Miss., for Carter.

Hunt Cole, Sp. Asst. Atty. Gen., Mike Moore, Atty. Gen., Jackson, Miss., for defendants-appellees, cross-appellants.

Before POLITZ, WILLIAMS, and JONES, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

This case involves a challenge by black citizens to Mississippi's voter registration system. The plaintiffs alleged in the district court that Mississippi's dual registration system and prohibition on satellite registration violated the Fourteenth and Fifteenth Amendments to the United States Constitution, 42 U.S.C. §§ 1971 and 1983, and the Voting Rights Act of 1965, as amended 42 U.S.C. § 1973. Named defendants included the Governor, Attorney General, and Secretary of State of Mississippi.

The district court agreed with the plaintiffs that the existing system violated § 2 of the Voting Rights Act, but refused to order immediate relief for the violation. Instead, as its remedy, the court gave the Mississippi Legislature an opportunity to cure the violations by amending its existing voter registration procedures during its then upcoming session. The court outlined the minimum changes necessary to bring the state's system of voter registration into compliance with the Voting Rights Act. The legislature amended its voter registration laws during that session, adopting a bill incorporating the recommendations of

the district court. After reviewing this statute, the district court held that the Mississippi voter registration laws no longer violated the Voting Rights Act.

On appeal, the original plaintiffs allege that the legislative changes did not fully remedy the past violations occasioned by Mississippi's discriminatory laws. The state of Mississippi cross-appeals, claiming that the district court erred in its original finding of a violation of the Voting Rights Act. We affirm both the finding of a violation and the approval of the legislative remedy.

### Facts

Mississippi has a long history of using voter qualifications and registration procedures to impede black citizens' participation in the political process. When passage of the Fifteenth Amendment prevented it from overtly denying the right to vote to its black citizens, Mississippi resorted to indirect methods to accomplish the same result. Devices used by Mississippi to inhibit black voters include poll taxes, literacy tests, residency requirements, "good moral character" tests, a disenfranchising crimes provision, and white primaries. The district court's opinion chronicles the implementation of these obstacles to voter registration. *Mississippi State Chapter, Operation PUSH, et al. v. Allain, et al.,* 674 F.Supp. 1245, 1251–52 (N.D.Miss.1987). We need not repeat that history here.[1]

The Voting Rights Act of 1965 struck down the poll tax and discriminatory voter registration tests, but it did not in terms eliminate other discriminatory devices employed in Mississippi. The case underlying this appeal challenged two remaining features of Mississippi voter registration law under § 2 of the Voting Rights Act: the dual registration requirement and the prohibition on satellite registration.

Mississippi first adopted a dual registration procedure during its legislative session in 1892. As originally enacted, Mississippi's dual registration process required a citizen to register first with the county registrar (circuit clerk), to vote in federal, state, and county elections, and again with the municipal clerk to vote in municipal elections. Miss.Code of 1892, ch. 93, §§ 3028–29. The procedure in effect at the time plaintiffs filed their suit contained the same separate registration requirement. Miss.Code Ann. § 21–11–1 (1972).[2]

Mississippi had also severely restricted the ability of its county registrars to conduct voter registration at places other than the registrar's office. This prohibition on satellite registration began in 1955 when the Mississippi Legislature enacted a statute preventing the removal of the registration books from the county registrar's office except in limited circumstances. Miss. Laws, 1955 Extra Sess., ch. 103. Prior to the passage of this statute, Mississippi law *required* each county registrar to conduct some satellite registration at polling places in his or her county before each election. Miss.Code Ann. § 3211 (1942).

The original plaintiffs in this case filed their lawsuit in 1984 challenging the dual registration statute and the prohibition on satellite registration. Miss.Code Ann. §§ 21–11–1 and 23–5–29 (1972). Plaintiffs include two organizations, the Mississippi State Chapter, Operation PUSH, and the Quitman County Voters League. Additional plaintiffs are six eligible but unregis-

---

**1.** The Supreme Court's opinion in *State of South Carolina v. Katzenbach,* 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966) includes a general discussion on the use of discriminatory voter registration procedures in the South. Specific discussion of the history of election practices in Mississippi can be found in *United States v. Mississippi,* 380 U.S. 128, 131–36, 85 S.Ct. 808, 810–812, 13 L.Ed.2d 717 (1965). See Note, *Eradicating Racial Discrimination in Voter Registration: Rights and Remedies under the Voting Rights Act Amendments of 1982,* 52 Fordham L.Rev. 93 (1983).

**2.** In 1986, the Mississippi Legislature revised and recodified its Election Code. The recodified sections first appear in a 1986 Election Code Special Pamphlet. In this opinion, we cite to the 1972 Miss.Code Ann. for the statutes originally challenged by the plaintiffs. We cite to the recodified Election Code in the 1986 Special Pamphlet for the statutes after 1984 amendments. Finally, we cite to the 1989 Supplement to the Miss.Code Ann. for the statutes after 1988 amendments.

tered black voters, and three black registered voters. The plaintiffs brought suit individually and on behalf of two plaintiff classes certified by the district court of (1) all black citizens who were eligible to vote but not registered to vote, and (2) all black registered voters in Mississippi. Named as defendants in the action are the Governor, Attorney General, and Secretary of State of Mississippi, in their official capacity and as members of the State Board of Election Commissioners. Also included as defendants are the circuit clerks of two counties, representing a defendant class of Mississippi circuit clerks and county registrars, and the city clerks of three municipalities, representing a defendant class of all Mississippi municipal clerks and registrars. For convenience, we refer to the appellants in this opinion collectively as "PUSH".

PUSH challenged the dual registration system and the prohibition on satellite registration as devices enacted by the Mississippi Legislature with the intended purpose of limiting black voter registration. The dual registration system required separate registration with the county registrar to vote in these elections. Satellite registration was blocked by prohibiting the removal of the registration books. Registration could take place only in the registrar's office, generally located in the county courthouse.

Because a significant percentage of Mississippi's black citizens do not have (1) access to the transportation necessary to travel to the county courthouse to register, or (2) the type of jobs that would allow them to leave work during business hours to register to vote, the procedures allegedly resulted in black citizens registering to vote at a rate 25% lower than white citizens. PUSH claimed that these procedures and the resulting disparity in voter registration rates violated the Fourteenth and Fifteenth Amendments to the United States Constitution, 42 U.S.C. §§ 1971 and 1983, and § 2 of the Voting Rights Act, as amended 42 U.S.C. § 1973.

Before the case went to trial, in 1984 the Mississippi Legislature amended the challenged statutes. Relying on these amendments, the State asked the district court to dismiss PUSH's action for mootness. PUSH opposed the motion, and filed a supplemental complaint stating its objections to the new legislation. In that complaint, PUSH argued that the 1984 amendments left the dual registration system and the prohibition on satellite registration essentially intact.

The 1984 amendments altered the dual registration system by allowing voters to register with the circuit clerks or county registrars for federal, state, county, *and* municipal elections. Miss.Code Ann. § 23–15–39 (Spec.Pamph.1986). The amendments also required the State Board of Election Commissioners to appoint some municipal clerks as deputy county registrars. Miss.Code Ann. § 23–15–223 (Spec. Pamph.1986). Citizens in these municipalities could register with their municipal clerk for all elections. Miss.Code Ann. § 23–15–35(2) (Spec.Pamph.1986).

On their face, these amendments addressed the dual registration problem, but PUSH urged that limitations in the amendments maintained significant portions of the challenged system. First, the amendments were prospective only. Anyone who had registered with the circuit clerk prior to the 1984 amendments still had to register with the municipal clerk to vote in municipal elections. Miss.Code Ann. § 23–15–39(8) (Spec.Pamph.1986). Second, the mandatory deputization of municipal clerks applied only to cities with a population over 500 and with clerks who worked full-time. Miss.Code Ann. § 23–15–223 (Spec.Pamph.1986). Citizens in cities with a population less than 500 or employing clerks who did not keep full-time office hours still had to register with the county registrar to vote in elections other than municipal elections.

PUSH also alleged that the 1984 amendments had little impact on the prohibition on satellite registration. Although the new rule ostensibly allowed a registrar to conduct voter registration outside of his office, the prerequisites to the rule effectively prevented satellite registration. The new rule required approval of the county board of

supervisors prior to conducting satellite registration. It also limited satellite registration to polling places, and it left the use of the procedure to the unfettered discretion of the circuit clerks. Miss.Code Ann. § 23–15–37 (Spec.Pamph.1986). These limitations, it was urged, severely restricted the efficacy of satellite registration under the amended statutes.

The district court denied the motion to dismiss for mootness. The case proceeded to trial, and the court decided that the challenged statutes had a racially discriminatory impact on the plaintiffs in violation of § 2 of the Voting Rights Act. *PUSH v. Allain*, 674 F.Supp. at 1251.[3] Realizing that a legislative session was about to begin, the district court denied PUSH's request for injunctive relief, deciding instead to give the state legislature an opportunity to remedy the violations. The court then suggested four changes to the existing scheme as the minimum requirements necessary to bring the registration procedures into compliance with the Voting Rights Act: (1) make the 1984 amendments retroactive with regard to voters who registered with the circuit clerk prior to 1984 by implementing a procedure to transfer the names of these voters from the registration books of the circuit clerks to the municipal clerks; (2) require mandatory appointment of *all* municipal clerks as deputy county registrars; (3) require circuit clerks to conduct at least one day of satellite voter registration at three polling places in each county supervisor's district each state election year;[4] and (4) establish procedures for registering disabled voters.

The Mississippi Legislature responded by adopting Senate Bill 2610 ("S.B. 2610"). 1988 Miss.Laws, ch. 350 (codified as amended in Miss.Code Ann. §§ 23–15–14, 23–15–35, 23–15–37, 23–15–39, and 23–15–223 (Supp.1989)). The law met all the suggested requirements of the district court. It

also added an additional easing of registration requirements. The legislature required the county registrar to keep extended office hours for the five days preceding the deadline for voter registration for any primary or general election, and to open for a half day on the Saturday of that week. Miss.Code Ann. § 23–15–37(2) (Supp.1989). The United States Attorney General precleared S.B. 2610 pursuant to § 5 of the Voting Rights Act. 42 U.S.C. § 1973c.

PUSH objected to S.B. 2610, contending that the relief was not sufficient to remedy the racially discriminatory effects of Mississippi's past restrictions on voter registration. Instead, PUSH asked the court to order mail-in voter registration, voter registration in state and local agencies, and election day registration. PUSH also asked the court to require registrars to deputize lay persons to conduct door-to-door registration.

The district court held an evidentiary hearing to consider whether S.B. 2610 was an adequate remedy. Rejecting PUSH's arguments, the district court found that S.B. 2610 effectively remedied the violations of the Voting Rights Act. *Mississippi State Chapter, Operation PUSH, et al. v. Mabus, et al.*, 717 F.Supp. 1189 (N.D. Miss.1989). The court denied the additional relief requested by the plaintiffs. PUSH asks us to reverse that decision. The State cross-appeals, alleging error in the finding by the district court of violation of § 2 of the Voting Rights Act prior to the 1988 amendments to the Mississippi Election Code.

## I. PUSH's Appeal

In its November 1987 decision, the district court held that Mississippi's voter registration procedures violated black citizens' rights under § 2 of the Voting Rights Act of 1965. *PUSH v. Allain*, 674 F.Supp. at

---

3. Because the district court found a violation of the Voting Rights Act, it did not examine the challenged provisions under the Fourteenth and Fifteenth Amendments, or under 42 U.S.C. §§ 1971 and 1983.

4. In Mississippi, each of the state's 82 counties is broken down into five supervisory districts for purposes of conducting elections. The district court's suggestion would result in 15 additional registration sites in each county in Mississippi in addition to the municipal registration sites and the office of the circuit clerk.

1268. Section 2 of the Voting Rights Act states, in pertinent part:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State ... in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color....

42 U.S.C. § 1973. The court found that Mississippi's voter registration laws were "voter qualifications" or "prerequisites to voting" subject to the constraints of § 2. *Id.* at 1262. The State does not challenge that finding.

The district court then examined Mississippi's voter registration procedures to determine whether they violated § 2 of the Voting Rights Act. Prior to the 1982 amendments to the Voting Rights Act, a party had to establish discriminatory intent to prove a § 2 violation. *See City of Mobile, Ala. v. Bolden,* 446 U.S. 55, 62, 100 S.Ct. 1490, 1499, 64 L.Ed.2d 47 (1980). The 1982 amendments replaced the "intent test" with a "results test." *See Thornburg v. Gingles,* 478 U.S. 30, 35, 106 S.Ct. 2752, 2758, 92 L.Ed.2d 25 (1986). Under the new test, a plaintiff in a § 2 case must show that based on the totality of the circumstances, the electoral process is "not equally open to participation by the members of a [racial minority] in that its members have less opportunity than other members of the electorate to participate in the political process." 42 U.S.C. § 1973(b).

The Senate Judiciary Committee Report accompanying the act that amended § 2 listed "objective factors" to aid the courts in evaluating a § 2 claim:

1. The extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts ... or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

S.Rep. No. 417, 97th Cong., 2d Sess. 28–29, *reprinted in* 1982 U.S.Code Cong. & Admin.News 177, 206–07. The Report emphasized that the list of factors was not meant to be exclusive. Congress intended the listed factors only to illustrate some of the variables a court should consider in determining whether a state had violated § 2.

Applying the factors set out in the Senate Report, the district court found that Mississippi voter registration procedures resulted in black citizens in Mississippi registering to vote at a rate 25% lower than white citizens. Coupled with a history of discriminatory voter registration procedures, this disparity in registration rates evidenced that Mississippi's dual registration system and prohibition on satellite registration violated § 2. Having found a violation of § 2, the district court proceeded to determine the appropriate remedy for the violation. PUSH now quarrels with the statutory remedy accepted later by the district court.

### A.

■ As a preliminary matter, we find that the district court properly deferred to the Mississippi Legislature in the first instance to remedy the existing violations. The district court noted, and we confirm, that there are no cases specifically defining

the court's remedial authority in the context of a voter registration challenge under § 2. We agree with the district court that § 2 reapportionment cases provide an appropriate source of guidance. In the reapportionment cases, courts clearly defer to the legislature in the first instance to undertake remedies for violations of § 2. *See Upham v. Seamon,* 456 U.S. 37, 40–42, 102 S.Ct. 1518, 1521, 71 L.Ed.2d 725 (1982). Judicial authority to fashion a plan of reapportionment arises only after the state legislature is given an opportunity to enact a constitutionally acceptable plan and does not do so. *White v. Weiser,* 412 U.S. 783, 794, 93 S.Ct. 2348, 2354, 37 L.Ed.2d 335 (1973).[5] Voter registration, like reapportionment, is a function over which state legislatures should have primary jurisdiction. Accordingly, the district court properly gave the Mississippi Legislature an opportunity to cure the infirmities in its voter registration procedures.

 The central question is whether the district court abused its discretion in approving S.B. 2610 as a remedy complying with the requirements of § 2. Our starting point is the Senate Report accompanying the 1982 amendments to § 2 of the Voting Rights Act. It describes the district court's remedial duty as follows:

> The basic principle of equity that the remedy fashioned must be commensurate with the right that has been violated provides adequate assurance, without . . . prescribing in the statute mechanistic rules for formulating remedies in cases which necessarily depend upon widely varied proof and local circumstances. The court should exercise its traditional equitable powers to fashion the relief so that it completely remedies the prior dilution of minority voting strength and fully provides equal opportunity for minority citizens to participate and to elect candidates of their choice.

1982 U.S.Code Cong. & Admin.News 177, 208. Congress derived this standard from *Louisiana v. United States,* 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965), a case challenging Louisiana's use of a constitutional interpretation test as a qualification for voter registration. PUSH argues that the State failed to show that S.B. 2610 will satisfy this remedial mandate.

We must look beyond the general remedial statement articulated by Congress to determine the district court's duty in this case. Supreme Court decisions and our own jurisprudence offer some help in defining the scope of the district court's "traditional equitable powers" in discrimination cases. The Supreme Court instructs us that the equitable powers of a court are broad, but not unlimited. *Whitcomb v. Chavis,* 403 U.S. 124, 161, 91 S.Ct. 1858, 1878, 29 L.Ed.2d 363 (1971). In an equity case, the nature of the violation determines the scope of the remedy. *Swann v. Charlotte–Mecklenburg Bd. of Educ.,* 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971). We have held that an equitable remedy must be fashioned to address the constitutional violation established. *Haitian Refugee Center v. Smith,* 676 F.2d 1023, 1041 (5th Cir.1982).

These general principles of equity provide our primary touchstone for reviewing the district court's remedial decree, but we also have one additional consideration. In this case, the Mississippi Legislature tendered a newly enacted statute to the court as the accomplishment of a remedy for the violations. The § 2 vote dilution cases explain the district court's duty when the local government offers its own remedy for voting rights violations. Our decision in *Seastrunk v. Burns,* 772 F.2d 143, 151 (5th Cir.1985) states the standard rule as applied in reapportionment cases: "The feder-

---

5. Decisions in the school desegregation context also support a rule of deference to state lawmaking bodies in formulating equitable remedies. The Supreme Court has indicated that "one of the most important considerations governing the exercise of equitable power is a proper respect for the integrity and function of local government institutions." *Missouri v. Jenkins,* —— U.S. ——, 110 S.Ct. 1651, 1663, 109 L.Ed.2d 31 (1990). Judicial authority to prescribe remedies in school desegregation cases arises only if local school authorities fail in their obligation to proffer acceptable remedies. *Swann v. Charlotte–Mecklenburg Bd. of Educ.,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971).

al district court is precluded from substituting even what it considers to be an objectively superior plan for an otherwise constitutionally and legally valid plan that has been proposed and enacted by the appropriate state governmental unit." The district court must accept a plan offered by the local government if it does not violate statutory provisions or the Constitution. *Wright v. City of Houston, Miss.*, 806 F.2d 634, 635 (5th Cir.1986).

Applying this rule to S.B. 2610, the district court approved the new legislation as adequate to remedy the § 2 and alleged constitutional violations. Although the court recognized that the legislature could have enacted legislation easing registration even further, the fact that broader relief was possible did not authorize the court to invalidate the proffered solution. The court found that the new procedures implemented by S.B. 2610 would have a positive effect on voter registration if unregistered voters took advantage of the expanded procedures. *PUSH v. Mabus*, 717 F.Supp. at 1193. We hold that the district court applied the correct legal standards to the legislation and did not abuse its discretion in approving S.B. 2610 as a remedy for the violations.

Although Mississippi has a long history of discriminatory voter registration procedures, this case represented the first challenge to its dual registration requirement and satellite registration limitations. The Mississippi Legislature responded to the district court's finding of a voting rights violation by enacting legislation eliminating the dual registration requirement and broadly establishing satellite registration.

We also note that S.B. 2610 reasonably accommodates the relief PUSH requested in its original and supplemental complaints. The district court fashioned its suggestions to the Mississippi Legislature from the specific relief requested by PUSH. PUSH did not explicitly request mail-in registration, agency-based registration, or election day registration until the State enacted S.B. 2610 and offered it to the court.

PUSH contends that S.B. 2610 is not an effective remedy because it will not eliminate the disparity in black and white voter registration rates. The problem with PUSH's argument is that it is premature. PUSH's experts testified that the new legislation would not eliminate the disparity in black and white voter registration. But this testimony was purely speculative as to the effect of the modified registration procedures on black voter registration. PUSH's appeal to this Court came before voter registration under the changes could be evaluated. The district court held that PUSH failed to offer objective proof that the new procedures would have inadequate effect on registration rates. We agree with that conclusion. This was an attack upon the validity of the statute on its face, not on experience under its operation.

We emphasize that nothing in this opinion prevents PUSH from bringing a future challenge to Mississippi's voter registration procedures. If the disparity between black and white voter registration rates remains unreasonably distorted under the new legislation, PUSH may undertake to establish with statistical evidence that the voter registration procedures, as amended by S.B. 2610, still violate § 2. The record now before us does not set out any evidence to establish that contention. The district court properly found that S.B. 2610 removed the statutory flaws in Mississippi voter registration procedures. We have no basis for reversing that decision.

B.

In the preceding section, we concluded that the district court properly deferred to the judgment of the Mississippi Legislature by accepting S.B. 2610 as adequate to remedy the § 2 violation. Authority for this rule of judicial deference to legislative judgment appears in voting rights cases dealing primarily with redistricting or reapportionment. The redistricting cases do contain one exception to this rule of deference which we must apply to this case. A legislative plan cannot remedy a violation of the Voting Rights Act if the plan itself is racially motivated. *Kirksey v. Board of Supervisors of Hinds Cty., Miss.*, 554 F.2d 139, 142 (5th Cir.) (en banc),

*cert. denied,* 434 U.S. 968, 98 S.Ct. 512, 54 L.Ed.2d 454 (1977). A remedy for a § 2 violation must not itself grow out of a discriminatory intent. *Dillard v. Crenshaw Cty., Ala.,* 831 F.2d 246, 249 (11th Cir.1987); *Edge v. Sumter Cty. School Dist.,* 775 F.2d 1509, 1510 (11th Cir.1985). The district court in this case could not properly accept S.B. 2610 as a remedy for the § 2 violation if the Mississippi Legislature enacted the bill with the discriminatory intent of maintaining low black voter registration. Relying primarily on evidence that the Mississippi Legislature failed to pass two proposed bills containing "better" voter registration procedures, PUSH claims that S.B. 2610 was enacted for a discriminatory purpose.

Whether the Mississippi Legislature enacted S.B. 2610 for a discriminatory purpose is a question of fact subject to review under the clearly erroneous standard. *Seastrunk v. Burns,* 772 at 151; *Jones v. City of Lubbock,* 727 F.2d 364, 370–71 (5th Cir.1984). Although the district court recognized in its opinion that PUSH was alleging discriminatory purpose in the passage of S.B. 2610, the court did not include a specific finding addressing this claim. The district court held, however, that PUSH's evidence as a whole did not establish any constitutional or statutory flaws in S.B. 2610. *PUSH v. Mabus,* 717 F.Supp. at 1192. Implicit in this holding is a finding that the Mississippi Legislature did not enact S.B. 2610 for a discriminatory purpose.

PUSH first argues that the Mississippi Legislature enacted S.B. 2610 instead of House Bill 838 ("H.B. 838") for the discriminatory purpose of maintaining the present disparity between black and white voter registration. The Mississippi House of Representatives reported H.B. 838 out of committee during the same session that the legislature enacted S.B. 2610. The bill proposed by the house committee included provisions for the two main changes in current registration procedures now requested by

PUSH: agency-based voter registration and mail-in registration.

PUSH asserts that the legislature demonstrated discriminatory purpose merely by enacting the more limited S.B. 2610 rather than H.B. 838. PUSH also implies that the opposition of the Circuit Clerk's Association to H.B. 838 somehow demonstrates that the legislature acted with discriminatory intent. The rejection of this evidence as unpersuasive is not clearly erroneous. The existence of another bill containing more expansive registration procedures does not prove that the Mississippi Legislature enacted S.B. 2610 with the goal of limiting black voter registration.

Similarly, PUSH contends that the failure of the legislature later to enact H.B. 734 in its 1989 session shows discriminatory intent. H.B. 734 also contained provisions for agency-based registration and mail-in registration. PUSH offered evidence showing that individual circuit clerks lobbied against passage of the bill even though the Clerk's Association had promised to remain neutral. PUSH also alleges that the legislature converted H.B. 734 into a revenue bill to increase the number of votes necessary for its passage.[6] Finally, PUSH asks us to infer discriminatory reasons for the rejection of H.B. 734 from isolated and ambiguous statements made by Mississippi legislators during debate on the bill. The evidence offered by PUSH to establish discriminatory animus in the rejection of H.B. 734 is not compelling. What is even more attenuated is PUSH's argument that the failure to enact H.B. 734 during its 1989 session establishes that the legislature enacted S.B. 2610 during its 1988 session for a discriminatory purpose.

PUSH has not succeeded in establishing that the Mississippi Legislature adopted S.B. 2610 for a racially discriminatory purpose. S.B. 2610 addressed the problems the district court outlined when it reviewed the 1984 amendments to Mississippi's voter registration procedures. The legislature

---

**6.** In the Mississippi Legislature, a revenue bill requires a three-fifths majority in both houses for passage rather than a simple majority. Miss.Const. art. 4, § 70. H.B. 734 apparently

received a majority of the votes in the Mississippi House of Representatives, but not the requisite three-fifths majority.

enacted a statute responsive to the district court's order. Although PUSH would have preferred the passage of a statute requiring mail-in registration or agency-based registration, the fact that the legislature considered and rejected bills containing these provisions does not prove that the legislature acted with discriminatory intent.

In sum, PUSH's evidence can be characterized as no more than objection to typical aspects of the legislative process in developing legislation. Reasonable choices are to be made by the legislature not the courts. Senate bill 2610 established reasonable registration procedures common to many states. The district court properly accepted S.B. 2610 as a remedy for the violations of § 2.

## II. The State's Cross–Appeal

On cross-appeal the State asks us to reverse the decision of the district court finding a § 2 violation before S.B. 2610, the 1988 amendment, was enacted. All of the following analysis of the evidence is directed solely at the district court's decision that the 1984 law violated § 2 of the Voting Rights Act. It is not moot because the decision under the 1988 Act was the remedy decision growing out of the holding under the 1984 Act.

## A.

■ The State first claims that the district court erred when it found a § 2 violation under the 1984 law by analyzing the case on a statewide basis rather than a county by county basis. The district court found a 25% difference in the registration rates of eligible black and white voters in Mississippi. The evidence of this disparity consisted of data predicting the voter registration rates on a statewide basis. The State argues that the court should have examined registration rates in individual counties to determine whether Mississippi's voter registration laws violated § 2. The district court's failure to conduct a county by county analysis allegedly requires reversal.

The State argues that the Supreme Court's decision in *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986) mandates a county by county examination of voter registration rates. The argument misapplies the Supreme Court's decision. *Gingles* involved claims of vote dilution in six multimember districts caused by at-large voting. The district court in *Gingles* aggregated voting data from all six districts in finding legally polarized voting within each individual district. In a footnote, the Supreme Court indicated that courts must conduct a district specific inquiry to determine the existence of vote dilution caused by submergence in a multimember district. *Id.* at 59, n. 28, 106 S.Ct. at 2771, n. 28.

The decision in *Gingles* is inapposite to the voter registration challenge we consider here. Unlike the claims of racial gerrymandering in discrete districts presented to the *Gingles* Court, we have before us a broad attack on voter registration laws with statewide application. As stated by the Supreme Court in an earlier challenge to Mississippi's registration procedures:

> The complaint charged that the State of Mississippi and its officials for the past three quarters of a century have been writing and adopting constitutional provisions, statutes, rules, and regulations, and have been engaging in discriminatory practices, all designed to keep the number of white voters at the highest possible figure and the number of colored voters at the lowest.

*United States v. Mississippi*, 380 U.S. 128, 143, 85 S.Ct. 808, 816, 13 L.Ed.2d 717 (1965).

PUSH claims that Mississippi's registration procedures hinder black citizens' ability to participate in the political process at the state as well as the county level. We find it difficult to conceive of a more appropriate measure of the discriminatory effects of these laws than figures representing disparity in registration rates between all black and white eligible voters in the state. Evidence of disparate registration rates or similar registration rates in indi-

vidual counties could not provide dispositive support for the position of either party.

To accept the State's argument we must read *Gingles* to require a district by district analysis in *any* case brought under § 2. *Gingles* does not include such a broad requirement. We agree with the State that a party must "fine tune" any statistical proof offered to prove discrimination. *See, e.g., Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, 2121, 104 L.Ed.2d 733 (1989); *Hazelwood School Dist. v. United States,* 433 U.S. 299, 308–13, 97 S.Ct. 2736, 2742–44, 53 L.Ed.2d 768 (1977). In *Gingles,* statistical proof of racially polarized voting in other districts was not relevant to the issue of vote dilution in the specific challenged district. Statistical proof of statewide voter registration rates is, however, relevant to prove the effects of voter registration laws with statewide application. PUSH offered the relevant comparison in this case by presenting evidence of the statewide disparity in black and white voter registration rates in Mississippi.

Furthermore, PUSH served interrogatories on the clerks in each of Mississippi's 82 counties to elicit information about registration practices. The district court admitted the answers to these interrogatories in evidence. Although the court was not required to make individual findings of disparate registration rates in individual counties, it did evaluate the evidence as part of its consideration of PUSH's claims. Contrary to the State's arguments, the district court did conduct an analysis of the effect of the registration laws on individual counties in Mississippi.

### B.

The district court found by a preponderance of the evidence that black citizens in Mississippi registered to vote at a rate 25% lower than white citizens in the state. *PUSH v. Allain,* 674 F.Supp. at 1255. On cross-appeal, the State argues that the district court erred in making this finding. Because the district court relied on the finding of registration disparity to hold that § 2 of the Voting Rights Act had been violated, the State seeks reversal of the lower court's decision.

The district court's determination that black citizens in Mississippi registered to vote at a rate 25% lower than white citizens was a factual finding reviewable under the clearly erroneous standard. *See Thornburg v. Gingles,* 478 U.S. at 78, 106 S.Ct. at 2780–81. We do not disturb this factual finding of the district court unless we are firmly convinced after a review of the entire record that a mistake has been made. *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). The mere fact that we might have arrived at a different conclusion than the district court will not support reversal: "If the district court's account of the evidence is plausible in light of the record ..., the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. City of Bessemer City,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

The State disputes the district court's factual finding on four grounds. The State argues that (1) the finding is based on the flawed voter registration study of Dr. Lichtman, (2) recent Mississippi district court opinions have disputed the finding, (3) available voter registration records contradicted the finding, and (4) data from the United States Census Bureau conflicted with the finding. Basically, the State claims that the district court should have accepted its proof rather than the evidence submitted by PUSH. PUSH presented sufficient evidence to support the court's finding. A brief discussion of each of the objections made by the State establishes that the district court did not err in making this finding.

### 1. Dr. Lichtman's Study

The district court relied heavily on data presented by PUSH's expert, Dr. Lichtman, in finding the 25% disparity in voter registration rates in Mississippi. The State disputes Dr. Lichtman's study and the district court's acceptance of the study's conclu-

sions. The State argues that the study was flawed by its time frame and geographical limitations.

Determining voter registration rates from registration lists is difficult since registration records do not include the race of the voter. Dr. Lichtman's study relied on jury questionnaires mailed to a random sample of citizens in the Federal Court Northern District of Mississippi. Mississippi's jury rolls include only registered voters, and the sworn questionnaire required prospective jurors to disclose their race. After applying independent statistical tests to verify the results of the questionnaires, Dr. Lichtman projected that 79% of the white voting age population ("VAP") in Mississippi registered to vote while the black VAP had a registration rate of only 54%. The district judge accepted Dr. Lichtman's conclusion that black citizens registered to vote in Mississippi at a rate 25% lower than white citizens.

The State faults Dr. Lichtman's study because of its reliance on mailings to persons registered before the contested 1984 amendments. Dr. Lichtman's study collected data from yearly mailings in 1981–1985. The implicit assumption in this argument is that the changes made by the 1984 amendments greatly affected the disparities in voter registration rates. The State offered no proof to support this assumption. Dr. Lichtman's figures from his 1985 mailing, after enactment of the 1984 amendments, did not differ appreciably from the data for 1981–1984. As the district court found, the 1984 amendments did not address the primary restrictions on voter registration. We agree with PUSH that the use of voters registered prior to 1984 did not taint Dr. Lichtman's study to a degree requiring reversal.

The State also argues that the district court could not accept Dr. Lichtman's study because it considered only voter registration rates in the Northern District of Mississippi, and does not examine registration rates in the more populous counties in the Southern District. The State claims that Dr. Lichtman's study could not properly be extrapolated to a different area with different demographics. Dr. Lichtman's study included 37 of Mississippi's 82 counties. The State offers no evidence beyond speculation to prove that the geographic location of the study affected the results. This argument also seems disingenuous since the State offered Census Bureau figures to dispute Dr. Lichtman's finding of a 25% disparity. The Census Bureau figures relied on a much smaller sample than that used by Dr. Lichtman. The State failed to show glaring deficiencies in Dr. Lichtman's study requiring reversal.

2. Court Opinions

To support its claim that the district court's finding of a 25% disparity is clearly erroneous, the State refers us to the decisions of other Mississippi district courts. The State offers these opinions to show that other courts had not found a large disparity in voter registration rates in Mississippi, and had refused to accept Dr. Lichtman's study.

The State cites two reported opinions in which other courts refused to accept Dr. Lichtman's study. *Gunn v. Chickasaw County, Miss.*, 705 F.Supp. 315, 320–21 (N.D. Miss.1989) (Judge Davidson); *Martin v. Mabus*, 700 F.Supp. 327, 335–36 (S.D. Miss.1988). We only evaluate these findings in passing. Neither case involved a challenge to voter registration practices— the voter registration issue entered the cases only tangentially. Other district courts in Mississippi accepted Dr. Lichtman as an expert on voting rights issues. *See Martin v. Allain*, 658 F.Supp. 1183, 1193–94 (S.D.Miss.1987); *Jordan v. City of Greenwood, Miss.*, 599 F.Supp. 397, 402 (N.D.Miss.1984). His study focused specifically on voter registration rates in the state. In this case, which addressed voter registration inequities, the district court was justified in accepting Dr. Lichtman's data.

The State cites three other cases to support its position. These cases involve, respectively, voting rights challenges in one small town and two rural counties in Mississippi. *See Monroe v. City of Woodville, Miss.*, 688 F.Supp. 255, 257 (S.D.Miss.1988),

*aff'd,* 881 F.2d 1327 (5th Cir.1989) (additional case history omitted); *Lucas v. Bolivar County,* No. DC 83–136–WK–O (N.D.Miss. Feb. 14, 1984) (unpublished memorandum decision); *Moore v. LeFlore County,* No. GC 83–249–WK–O (N.D.Miss. June 5, 1985) (unpublished memorandum decision). Each of these cases includes findings of either no disparity in voter registration rates between black and white citizens or a voter registration disparity rate much lower than 25%. We agree with PUSH that a finding of little or no registration rate disparity in cases involving individual towns or counties fails to impeach Dr. Lichtman's broad study of overall registration rates in Mississippi.

### 3. Voter Registration Data from Yazoo and Quitman Counties

The State also offers evidence of voter registration rates from available data in Quitman and Yazoo counties to show that the disparity in registration rates in Mississippi was minor. The State argues that this evidence somehow proves that the district court's finding of a 25% disparity is clearly erroneous. The figures, if accurate, show only that in at least two Mississippi counties the voting rate disparity was not as great as the 25% determined by the district court. The figures do not establish that the district court's finding of a *statewide* disparity of 25% is clearly erroneous.

### 4. Census Bureau Data

The State relies heavily on data from the United States Census Bureau for its argument that voter registration rates did not significantly vary between black and white citizens in Mississippi. The 1984 Census Bureau data proffered by the State showed that 85.6% of eligible black citizens registered to vote as compared with a registration rate of 81.4% for white citizens. The district court refused to credit the Census Bureau data, relying instead on the conclusions of Dr. Lichtman.

At trial, PUSH offered substantial evidence showing that the Census Bureau figures were not reliable. The biggest problem with the figures is that they are derived from uncorroborated self-reporting. PUSH offered evidence to show that people responding to Census Bureau questionnaires tended to overreport, especially on questions involving voting. PUSH also offered evidence demonstrating that black respondents to the questionnaire overreported voter registration at a higher rate than white respondents. Finally, PUSH questioned the sampling and validation techniques employed by the Census Bureau study.

Substantial evidence supports the district court's decision to accept PUSH's evidence and to refuse the Census Bureau figures offered by the State. Dr. Lichtman's study, in contrast to the Census Bureau figures, used data corroborated by official registration records. We cannot say that the district court's finding based on Dr. Lichtman's study was clearly erroneous in light of the evidence casting doubt on the accuracy of the Census Bureau results. The State has failed to establish that the district court's finding of a 25% disparity in voter registration rates before the 1988 statute is clearly erroneous.

### Conclusion

The district court determined that the 1984 amendments to Mississippi's voter registration laws did not cure the violations of § 2 of the Voting Rights Act caused by those laws. After suggesting the minimum changes necessary to bring the laws into compliance with § 2, the court gave the Mississippi Legislature the opportunity to cure the violations. During its 1988 session, the legislature enacted Senate Bill 2610, incorporating the changes suggested by the district court. The district court held that S.B. 2610 remedied the violations of § 2.

PUSH challenges the validity of S.B. 2610 on its face and argues that the changes made by S.B. 2610 do not go far enough to eliminate the current disparity in voter registration rates. While recognizing that the additional relief requested by PUSH might increase black *and* white voter registration rates in Mississippi, we cannot say that the district court erred by

accepting S.B. 2610 as an appropriate remedy for the racially discriminatory violation. PUSH also failed to show that the passage of the bill was tainted by discriminatory purpose.

As to the cross-appeal, we find that the State's contentions, under the decision based upon the pre-S.B. 2610 law have no merit. The district court's finding of a 25% disparity in registration rates was not clearly erroneous. It also was appropriate for the court to consider evidence of statewide disparity to determine if Mississippi's procedures violated § 2.

Accordingly, we AFFIRM the district court's decision in all respects.[7]

AFFIRMED.

---

**7.** Mississippi continues to broaden the opportunity for voter registration. On April 1, 1991, the Mississippi Governor signed newly enacted legislation providing for mail-in voter registration. If the new legislation is precleared by the Justice Department under § 5 of the Voting Rights Act, 42 U.S.C. § 1973c, Mississippi will have mail-in voter registration effective July 1, 1992.